**SODA MOUNTAIN WILDERNESS COUNCIL and Klamath Forest Alliance, Plaintiffs,**

v.

**Gail NORTON, et al., Defendants.**

**No. CIVS042583LKKCMK.**

United States District Court, E.D. California.

March 24, 2006.

Sharon Eileen Duggan, Law Office of Sharon E. Duggan, Oakland, CA, William H. Sherlock, Hutchinson, Cox, Coons, Dupriest, Orr and Sherlock PC, Eugene, OR, for Plaintiffs.

Ernest Robert Wright, U.S. Attorney Office, Sacramento, CA, for Defendants.

## ORDER

KARLTON, Senior District Judge.

Plaintiffs, the Soda Mountain Wilderness Council (SMWC) and the Klamath Forest Alliance (KFA), have brought suit against the Bureau of Land Management

(BLM) (and its relevant officials and parent agency). They allege that the agency has violated the National Environmental Policy Act (NEPA), the Administrative Procedure Act (APA), and the Federal Land Policy and Management Act (FLPMA). The suit arises out of a proposed amendment to the land management plan for the Redding Resource Area concerning acquisitions of land for the Horshoe Ranch Wildlife Area (HRWA). The parties have both filed cross-motions for summary judgment and submitted an additional round of briefing at the court's request on the question of standing.

## I.

## FACTS

### A. THE HORSESHOE RANCH WILD-LIFE AREA

In 1977 the California Department of Fish and Game (CDF & G) bought the B.B. Miller cattle ranch to protect the principle wintering grounds of the Jenny Creek black-tail deer herd. Excerpt of Record (ER) 013; Administrative Record (AR) 00112. This action established the Horseshoe Ranch Wildlife Area as a public deer habitat preserve. It is located just south of the California–Oregon border, east of Interstate 5 and north of the Klamath River. *Id.* Miller's land was checkerboarded alongside one-mile square sections of public land managed by the Bureau of Land Management. *Id.;* Map at ER 030; AR 00136. Since then, BLM and the CDF & G have co-managed the checkerboarded ranch as a Wildlife Area. CDF & G has taken the leadership role in wildlife management pursuant to a 1983 Memorandum of Understanding between the two agencies. ER 013; AR 00112,

05288–05319. CDF & G has managed primarily to enhance and protect deer winter range habitat, and provide public access for hunting and other recreational pursuits. *Id.*

At the time of the original purchase, only the lands outlined on Map 3 of the Final EA were fenced as a part of the B.B. Miller Ranch. ER 013, AR 00112; Map at ER 030, AR 00136. Sections 22 and 34, located on the western boundary of the fence, were already in BLM ownership but were used for grazing by other ranchers. ER 013, AR 00112. In 1983 the CDF & G and BLM completed a Habitat Management Plan that included Sections 22 and 34 as part of the HRWA. *Id.* Although outside the fenced boundaries, the CDF & G has administered the HRWA with sections 22 and 34 considered part of the wildlife area. *Id.*

In 1992, the eastern half of section 21, T. 48N., R.6W., contiguous with section 22, was acquired by a land exchange consistent with the existing Management Framework Plan, with the intention of including it in the HRWA. *Id.* The final configuration of land being actively managed as a wildlife area by the CDF & G in 1992 was the original ranch plus one half of Sections 21 [1] and all of Sections 22, and 34. *Id.*

### B. THE 1993 REDDING RESOURCE AREA MANAGEMENT PLAN

In June 1993, the Redding Resource Area BLM, issued a Record of Decision (1993 ROD) for the Redding Resource Management Plan (RRMP). ER 070. The new Redding Resource Management Plan (1993 RRMP), declared itself a "compact with the public" resulting from a "four year process of collaboration with

---

1. It appears that the eastern half of section 21 may not have been a formal part of the HRWA boundary although it was effectively treated as a portion of the boundary by being managed that way. *See* AR 00112 and 00115.

the public, State agencies, other Federal agencies, and, especially county governments and local organizations." ER 070. One goal of the plan was to "dramatically shift" the BLM land ownership pattern "from more than 1,000 scattered parcels to less than twenty five large aggregates of accessible and useful public lands" with "outstanding recreational opportunities and unusual or imperiled biological resources." *Id.* One of the specific objectives of the 1993 RRMP was to "double the size" of the HRWA "to benefit deer." ER 071. This would be accomplished by disposing of the widely scattered, and thus hard to manage public lands, in favor of concentrating management on a few consolidated areas with unique resource values. AR 00112, CD# 1. "Expansion of public land administration westward would complement public management ... [i]n Oregon, enhance public accessibility, and provide more effective long term protection of the interstate deer herd." ER 080.

The 1993 RRMP listed as objectives for Horseshoe Ranch:

1. Improve the existing public administered deer winter ranch habitat and afford long-term protection for additional privately owned deer winter range habitat in cooperation with California Department of Fish and Game, Oregon Department of Fish and Wildlife and Ashland Resource Area BLM;

2. Allow long-term natural restoration of riparian zones to Class II or better;

3. Offer semi-primitive non-motorized recreation opportunities;

ER 076.

The 1993 RRMP identified a new boundary for Horseshoe Ranch and identified it as an area that would be a focus for long term management. AR 00118. The new

boundary included public land, as well as approximately 7,000 acres of privately held land to the west of Horseshoe Ranch. AR 00112.

It was intended that BLM would consider acquisition of land made available by willing sellers within the 1993 RRMP Horseshoe Ranch boundary, and once purchased, to manage the land consistent with the RRMP management objectives and land use allocations for Horseshoe Ranch. AR 00112, 00119, 00127; ER 077. Under the 1993 RRMP, if land was purchased within the Horseshoe Ranch boundary, no further RRMP amendment would be needed to manage the land as part of Horseshoe Ranch. AR 00112.

The redrawing of the Horseshoe Ranch boundary in 1993 did not expand the amount of public land in Horseshoe Ranch or the amount of land that was being actively managed as part of Horseshoe Ranch. AR 00120. Despite the boundary shown in the RRMP, the BLM administrative boundary remained the boundary shown in the 1983 Habitat Management Plan. AR 00120.

The Final Environmental Impact Statement for the RRMP measured impacts to deer populations primarily in terms of the number of acres placed into or removed from public stewardship. ER 082–83.

## C. AMENDMENTS TO THE 1993 RRMP

Within a year of the 1993 ROD, the RRMP was amended by the Northwest Forest Plan. ER 124. Although the Northwest Forest Plan dealt primarily with spotted owl habitat, it recognized the Soda Mountain area, which includes the HRWA.[2] It said:

2. The government notes that the citation does not state that the HRWA is within the Soda Mountain Area, although it is not clear whether they dispute the fact or just the citation.

This decision recognizes the special biological qualities of this unique area and directs the BLM to evaluate carefully the values of the Soda Mountain area as a biological connectivity corridor and propose any additional management protection necessary, including a special designation, through the BLM resource management plan, to protect those values.

ER 126.

## D. THE CASCADE SISKIYOU ECOLOGICAL EMPHASIS AREA AND NATIONAL MONUMENT

The Northwest Forest Plan also established the Cascade Siskiyou Ecological Emphasis Area (CSEEA), primarily because of its "unique diverse ecological and biological characteristics." ER 098. The majority of the CSEEA was in Oregon, and the Medford BLM was given the primary responsibility for producing a management plan. *Id.;* ER 107, CSEEA Alternative A Map 39. One of the major decisions for the planning process was establishment of the boundary. ER 101. Four of the five alternative boundaries included some portion of the Horseshoe Ranch within the CSEEA boundary. ER 106–16. Three of the five alternatives included the area currently in question as an active acquisition interest area. *Id.*

Planning for the CSEEA was cut short by the declaration of the Cascade Siskiyou National Monument.[3] The public comment period for the CSEEA's draft EIS was scheduled to end on June 14, 2000, ER 097, but the new monument was proclaimed by the President on June 9, 2000, ER 119, Proclamation No. 7318, 65 FR 37249 (June 13, 2000). This obviated the

need for any further planning for the CSEEA. ER 117, AR 05048.

Although the boundary of the Monument coincided with the state line, the Medford and Redding BLM agreed that since "ecological processes of the natural landscape are not constrained by administrative borders," they would manage all the ecologically-contiguous areas in the HRWA consistent with the "principles and policies explicit in the Presidential Proclamation." ER 178–80.

On the California side of the border, two sections of land within the acquisition interest area of the HRWA were offered for sale to the BLM in 1995. ER 014, AR 00113. During the public participation process initiated by the BLM, private landowners in the vicinity of the HRWA expressed opposition to federal acquisition of additional lands. *Id.* Some private landowners and neighbors expressed fears that federal acquisitions would result in a loss of county tax base and that "their traditional livestock operations and way of life on private lands were threatened with being prohibited." *Id.* The Siskiyou County Board of Supervisors requested that the BLM amend the Redding Resource Area to reduce the boundary of the HRWA back to the original 1977 size. *Id.; see also* ER 127 (letter dated Aug. 10, 1999 from Siskiyou County Board of Supervisors). As a result of the concerns raised, BLM withdrew from the purchase of the parcels. AR 00113.

In February of 2000, the BLM announced that it would begin a process to consider amending the boundary of the HRWA. The first step was issuing a notice of intent to consider the proposal by Siskiyou County to amend the RRMP Horse-

---

3. The Cascade Siskiyou National Monument was created to protect its "unmatched" biological diversity, and value as "biological crossroads" among many other more specific values. ER 119, Proclamation No. 7318, 65 FR 37249 (June 13, 2000).

shoe Ranch boundary and to initiate public scoping. ER 014, AR 00113, 00437–38.

## E. THE 2003 RRAMP AMENDMENT PROCESS

### 1. *Scoping*

In February of 2000, the BLM announced a 30–day scoping review for a proposed amendment to reconsider the boundary of the HRWA. ER 014, AR 00113; *see also* ER 134, AR 00435, 65 Fed.Reg. 11,074 (Mar. 1, 2000). The Federal Register did not mention the concerns about erosion of ranching lifestyles, loss of tax base, or any of the other concerns that had led to the request by the Siskiyou County Board of Supervisors. ER 134, AR 00435; 65 Fed.Reg. 11,074 (Mar. 1, 2000). The notice declared that a "proposal" had been received to "review the existing boundary" and that the alternatives will include expansion, reduction, and no action. *Id.* BLM held several public meetings in Siskiyou County prior to the issuance of the EA to explain the proposal to amend the RRMP Horseshoe Ranch boundary. AR 00113. Over 700 comments were received. ER 014, AR 00113.

The California Department of Fish and Game (CDF & G) with whom the BLM co-managed the area expressed the following comments about the possible reduction in acquisition interest area in the HRWA:

> In our initial review of the RMP, we voiced concern about loss of public opportunity because there was a net loss of public lands. That concern was mitigated by features in the RMP that provided for the acquisition of lands from willing sellers that included wetlands in the Shasta Valley and lands between Interstate 5 and the western boundary of the Horseshoe Ranch Wildlife Area.... The existing Horseshoe Ranch which we cooperatively manage is receiving increasing public use and the habitat im-

provement projects we have implemented have resulted in improved habitat for wildlife. Given that we feel it is very important that the RMP continue to provide direction to acquire lands from willing sellers within the designated area.

ER 135–36, AR 04254–55.

Felice Pace, of Klamath Forest Alliance, a plaintiff in this case, also commented on the amount of lands disposed of and acquired by the agency:

> BLM managers have "privatized" over 17,000 acres in this county and have another 21,000 plus "in process" for privatization. Yet, to date the BLM has only acquired about 1,700 acres in spite of the fact that there are willing seller's in the areas designated in the RMP for acquisition. THIS IS TOTALLY UNACCEPTABLE PERFORMANCE.
>
> ... the EIS must fully disclose the performance of the Redding BLM under the 199[3] Plan including the amount of land in Siskiyou County that was planned for disposal and acquisition and the actual amounts disposed of and acquired, as well as the reasons for the performance.

ER 137–38, AR 04369–70.

Klamath Forest Alliance also commented on the importance of the area as a biological corridor and asked that the BLM consider recent scientific studies in the area:

> ... This area has incredible biological importance as one of only three low-elevation breaches of the Cascade Range.
>
> ... the EIS must consider all the biological information collected through the KNF's Partners in Flight Program. This data documents the importance of the Klamath Corridor. For example, the program has found large numbers of willow flycatchers migrating through the

Klamath Corridor. The EIS must also fully consider scientific information in the recent assessment by Jim Strittholdt and Reed Noss, and recent investigations into the need for movement corridors in the NW to facilitate wildlife recolonization of areas from which they were previously extirpated.

*Id.*

Similarly, the California Wilderness Coalition, in a joint comment with the North Group of the Sierra Club Redwood Chapter specifically asked the BLM to consider the role of the Horseshoe Ranch "in providing regional habitat connectivity for plants and wildlife." ER 139. They also requested that the BLM consider how the various alternatives would influence the adjacent CSEEA. *Id.* Many commenters also asked the BLM to expand the HRWA acquisition interest area. *See* ER 140–44.

## 2. *The Draft Environmental Assessment*

A Draft Environmental Assessment (DEA) was published for comment in December of 2001, AR 00323, a year and a half after the declaration of the Cascade Siskiyou National Monument. ER 119, Proclamation No. 7318, 65 FR 37249 (June 13, 2000). The DEA was circulated for a 60 day public comment period. AR 00323. BLM received over 2,200 letters, postcards, emails and faxes commenting on the draft EA. AR 01049–04238G.

The DEA had three alternatives. AR 00341–00342. Alternative One reduced the boundaries of the HRWA to that of the original B.B. Miller ranch. AR 00341; Map at AR 00343. It excluded sections 21, 22, and 34, the unfenced section of the HRWA immediately to the west of the Miller ranch fence, and made them available for disposal to the private sector. *Id.* Alternative Two also shrank the RRMP boundaries, but continued to include sec-

tions 21, 22, and 34 along the western border. AR 00342(DEA); Map at AR 00344. Alternative Two initially provided management direction for acquisition interest in a substantially larger region than the 1993 RRAMP. *Id.* Specifically, it provided for the acquisition of private lands in the entire 1993 boundary plus lands to the south. *Id.* While this alternative provided official management direction in the text to acquire land if a willing seller offered it, no published map showed any official acquisition area boundary. Acquisitions were specifically limited to land offered by willing sellers, lands with high quality deer habitat, and undeveloped lands (lands where improvements represented less than 20% of the total value of the lands). *Id.* Alternative Three was the No Action alternative. *Id.;* Map at 00345. It would have kept the 1993 RRMP boundaries and policy of acquisition of private lands from willing sellers within the boundaries drawn in 1993.

CDF & G, the BLM's co-managers of the HRWA, supported Alternative Two at least partly because of the expanded acquisition interest area. ER 157, AR 01065–67. Specifically, CDF & G said that alternative represented "the greatest opportunity to retain and enhance deer winter range and other habitat near the HRWA and best meets the increasing public demand for recreational opportunities in the area." ER 156, AR 01066. CDF & G further stated that:

[t]he HRWA provides important winter range habitats for deer and supports a wide variety of other species of wildlife. Although deer occupy the HRWA year-round, most are migratory with the majority of the population summering in Oregon. The condition and the extent of deer winter range on the HRWA and surrounding lands are critical to the

health and persistence of deer herds in this region.

ER 156, AR 01066. CDF & G also reiterated their concern about the possibility of reducing the acquisition interest area:

In our initial review of the existing 1993 RMP, we expressed concern about the reduction in public lands and loss of public recreational opportunity proposed under that plan. Our concern was mitigated by features of the plan that provided for acquisition of lands west of the HRWA as well as wetlands in the Shasta Valley. This would have enhanced public use and resource values by more effectively configuring BLM lands. However since adoption of the RMP the BLM has disposed of 16,928 acres of public land and acquired only 1,657 acres of private land in Siskiyou County. None of those lands purchased by BLM were located in the vicinity of the HRWA.

*Id.*

The Oregon Department of Fish and Wildlife (ODFW) strongly supported Alternative 3, the no action alternative, because they believed it would provide the best wildlife management opportunity. ER 153–54, AR 01078–79. ODFW stated:

Southern Oregon and Northern California is home to one of the few migratory black-tailed deer herds in the Northwest. They summer in Oregon in the Siskiyou and Cascade Mountains, and winter along the California/Oregon border and south to the Klamath River. Populations of black-tailed deer in southwest Oregon have declined substantially in the last 10 years. Currently populations in the Rogue Unit are 35 to 40% below management objectives. Contributing factors to this decline are believed to be predation, diseases, development on winter ranges, and declining quantity and quality of forage on both

summer and winter ranges. In the years 1994 through 1999, 120 deer in the south Cascade and Siskiyou Mountains of Oregon and California (many in the HRWA) were trapped and fitted with radio collars. The movements of these deer were monitored throughout the year in order to document summer and winter ranges and migration routes. The area identified as critical winter range in the RRMP is consistent with the telemetry data from this study. We were not able to collar as many deer to the west of the HRWA. However, we expect deer densities to the west to be similar to those in the HRWA.

... Habitat improvement and long-term protection can be best accomplished through public administration. Because this is one of the last large undeveloped tracts of deer winter range in the region, and because of the critical need to provide long-term protection, ODFW supports the adoption of Alternative 3: The No Action Alternative; Implement the Redding RMP. *Id.*

### 3. *The Final Environmental Assessment*

On May 1, 2003, BLM revised the draft EA and issued the Proposed Plan Amendment to the Redding RMP and Environmental Assessment for the Horseshoe Ranch Wildlife Area (Proposed Plan Amendment and Final EA or FEA). ER 011, AR 00105, 00108. BLM received four protests on the Proposed Plan Amendment and Final EA. AR 00799–00867. The FEA analyzed the proposed amendment and three alternatives. AR 00105. This proposed alternative eventually became the selected alternative in the Decision Record. ER 002, AR 00003.

The proposed amendment changes the procedure required for acquisition of private lands to be added to Horseshoe

Ranch. AR 00124. The RRMP amendment consolidates the RRMP Horseshoe Ranch boundary with the BLM administrative boundary. AR 00124. The selected alternative used the formal boundaries described in Alternative Two but eliminated all mention of acquisition interest. ER 024, AR 00125. Instead, it stated that "only property immediately contiguous [4] to the HRWA boundary could be considered" and then only acquired if it met certain specified criteria. AR 00115. Additional criteria include winter deer habitat, recreational access, vulnerability of the property to development, consistency with the RRMP and land disposal acquisition goals, and "other management concerns." *Id.* The Final EA states that "BLM would consider private landowners' offer to sell adjacent lands for addition to the HRWA only if the private parcels are immediately adjacent to the boundary, and only if the land meets criteria for deer winter habitat." AR 00003; 00015. The only explanation in the FEA for the elimination of an acquisition interest area in Alternative 2 was that it was "confusing." ER 015, AR 00114.

Any land acquired under these circumstances could only be formally added to the HRWA by a plan maintenance action and the completion of a new EA. *Id.* Subsequent acquisitions after the acquisition of the "presently contiguous" parcels would be treated differently. ER 016, AR 00115. "Any subsequent proposed acquisitions of land not presently contiguous to the HRWA boundary would require a new plan amendment." *Id.* The Final EA states that "BLM would consider private landowners' offer to sell adjacent lands for

addition to the HRWA only if the private parcels are immediately adjacent to the boundary, and only if the land meets criteria for deer winter habitat." AR 00003; 00015. In other words, if the first layer of lands presently contiguous to the HRWA were ever acquired, BLM would prohibit itself from acquiring a second layer of contiguous land in the HRWA region without engaging in an entire RRAMP amendment process.[5]

### 4. The Record of Decision

On March 9, 2004, the BLM formally adopted the Proposed Amendment when it released its Decision Record and Finding of No Significant Impact (FONSI). ER 001–06, AR 00002–03. The RRMP amendment redrew the RRMP boundary of Horseshoe Ranch to incorporate only public land, excluding all private lands. AR 00115; ER 002, AR 00003; *see* map ER 007, AR 00008. Under the 1993 RRMP Horseshoe Ranch boundary, only public land was being managed as Horseshoe Ranch. AR 00120. It declared that BLM would "continue to manage for multiple uses, including permitted livestock grazing, on the approximately 1,200 acres in the western portion of the HRWA." ER 002, AR 00003. The FEA identifies these approximately 1,200 acres as sections 21, 22, and 34 that are currently outside the fenced boundary. ER 024, AR 00125.

Consistent with the Selected Alternative, the Decision eliminated the 1993 RRAMP acquisition interest area. ER 002, AR 00003. The ROD further stated that:

---

**4.** Elsewhere it states it must be "presently contiguous" to the existing HRWA to be considered. ER 024, AR 00125.

**5.** The government disputes the interpretation, stating that the record does not say that contiguous lands have to be purchased first. The

record, however, provides that "[a]cquired lands not contiguous with the RRMP amendment boundary would require an RRMP amendment to be managed as part of Horseshoe Ranch."

BLM has publicly expressed its intention to balance the approximately 17,000 acres of public land transferred from Federal ownership in Siskiyou County since 1993 by acquisitions of environmentally sensitive lands in other parts of the County. For this reason, and in response to a 1999 request by Siskiyou County, BLM eliminates the extensive area identified in alternatives 2 and 3 for potential federal acquisition of private lands. BLM does not actively pursue new acquisitions in connection with HRWA.

*Id.* Plaintiffs point out that no explanation is provided of how relinquishing its plan to acquire private land will "balance" the Agency's disposal of 17,000 acres of public land against the 1,600 acres it acquired.

## II.

### STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Sicor Limited v. Cetus Corp.,* 51 F.3d 848, 853 (9th Cir.1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sicor Limited,* 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *See also First Nat'l Bank,* 391 U.S. at 289, 88 S.Ct. 1575; *Rand v. Rowland,* 154 F.3d 952, 954 (9th Cir.1998). The opposing par-

ty must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir.1992) (quoting *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Cline v. Industrial Maintenance Engineering & Contracting Co.*, 200 F.3d 1223, 1228 (9th Cir.1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 290, 88 S.Ct. 1575; *See also T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *See also In re Citric Acid Litigation*, 191 F.3d 1090, 1093 (9th Cir.1999). The evidence of the opposing party is to be believed, *see Anderson*,

477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam* )); *See also Headwaters Forest Defense v. County of Humboldt*, 211 F.3d 1121, 1132 (9th Cir.2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## III.

## ANALYSIS

### A. STANDING

■ Before reaching the merits of the plaintiffs' case, the court must determine whether the Soda Mountain Wilderness Council (SMWC) and/or the Klamath Wilderness Forest Alliance (KWFA) have standing to bring this challenge under NEPA, FLPMA, and the APA. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (standing is a threshold jurisdictional question).

■■ There are two different elements to the standing inquiry. First, the plain-

tiffs must demonstrate that they have standing under Article III which requires a demonstration that:

> (1) [plaintiffs have] suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). For the SMWC and KWFA to show that they have standing to sue as associations on behalf of their members, they must demonstrate that one or more of its members would have standing to sue in their own right, that "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

Secondly, in order to bring suit under the APA the plaintiffs must prove that the interests they seek to protect fall under the interests that NEPA was designed to protect. *Kootenai Tribe of Idaho v. Veneman,* 313 F.3d 1094 (9th Cir.2002). Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

From all that appears, the defendants concede that the plaintiffs' interests fall within the "zone of interests" sought to be protected by NEPA and/or the FLPMA. The defendants contest, however, whether those interests have actually been affected by the action in question, and whether plaintiffs have demonstrated an injury in fact that is fairly traceable to the impacts

of the amendment. Defs.' Br. at 7; *see also Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Desert Citizens Against Pollution v. Bisson,* 231 F.3d 1172, 1179 (9th Cir.2000).

Plaintiffs have demonstrated that they have broad recreational and environmental interests in the well being of the HRWA and the surrounding property. Defendants claim that those interests are not affected by the proposed action because "BLM's action will not result in any changes to the public lands within Horseshoe Ranch that Plaintiffs' members may use or enjoy." Defs.' Br. at 7. By implication, the defendants appear to contend that since the surrounding land is private, plaintiffs can claim no right to contest the government's policy towards that land. The argument does not lie. An ability to use the adjacent land is simply not a requisite for standing.

The Ninth Circuit has specifically held that plaintiffs need not have access to land in order to demonstrate that they have an interest in the environmental protection of that land. In *Cantrell v. City of Long Beach,* the court concluded that plaintiff bird-watchers had standing to challenge the adequacy of an Environmental Impact Statement prepared by the Navy to support the proposed closure and later development of a naval base. 241 F.3d 674, 680 (9th Cir.2001). The Navy argued that because the plaintiffs had "no legal right to enter the closed station and gaze over the property line at the birds and their habitat" they could not establish standing. *Id.* at 680–81. The court noted that plaintiffs had "visited the areas in and around the station to observe the habitats" of the various bird species, and found that the removal of the bird habitats would affect their interest in future birdwatching in the

area. *Id.* at 680. The court concluded that

> we have never required a plaintiff to show that he has a right of access to the site on which the challenged activity is occurring, or that he has an absolute right to enjoy the aesthetic or recreational activities that form the basis of his concrete interest. If an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact.

*Id.* at 681 (citing *Laidlaw,* 528 U.S. at 182, 120 S.Ct. 693); *see also Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1120 (9th Cir.2005) (finding that although the development in question was private plaintiff had standing to sue "to preserve wildlife-viewing opportunities, both for its residents and others from publicly accessible locations.").

As *Cantrell* teaches, it is not necessary for the plaintiffs to prove only harm to the public lands already owned by BLM and the CDF & G to have standing. The plaintiffs have standing because the proposed action may affect the manner in which the private lands are managed in the future, a cognizable interest despite the plaintiffs lack of a right to access to the land. The declarations submitted by plaintiffs demonstrate that at least some of the organizations' members regularly travel to the edges of the public property. For instance, David Willis avers that he has

> ridden to the very edges of the property in question at least three dozen times. In fact, several of the best trail rides on which I regularly take visitors pass right by these areas. During these trip[s] the area in question is regularly in sight, and the ecological effects of the management of private lands can be readily observed.

Dec. of Willis at ¶¶ 3–4; Dec. of Felice Pace at ¶¶ 3 ("I have been to very edges of the property in question several times from the backcountry, and drive by it, and observe it from Highway 5.").

Moreover, even if *Cantrell* was not dispositive, it appears that plaintiffs would have standing. As they argue, there is record evidence that it is expected that there will be increased use of the public lands. *See, e.g.,* AR 04254–55 (the CDF & G noted that "the existing Horseshoe Ranch which we cooperatively manage is receiving increasing public use."). Common sense suggests that if the BLM does not acquire additional lands there will be adverse impact on the existing public land by virtue of its more intense use. Moreover, it is equally foreseeable that development on adjacent private land will adversely impact wildlife within the greater Soda Mountain area.

The maintenance of a healthy herd of Jenny Creek deer is a goal that is set out in the RRMP, and one that could possibly be hindered if there is greater impact on the public lands or if the private lands are developed. *See* Final EA, AR 00112 ("The HRWA is managed primarily to enhance and protect deer winter range habitat and provide public access for hunting and other recreational pursuits."); *see also* 1993 RRMP at 1, ER 071 (If the RRMP was adopted the "BLM would double the size of the Horseshoe Ranch habitat Management Area to benefit deer.") and 4–20, ER 082 ("if current population growth in the northern part of the state continues as predicted development will adversely impact deer winter range habitat.").

The court wishes to emphasize that here it is not deciding that there will be any significant impact on the environment. All that is necessary for standing, however, is a causal connection between the interests of the plaintiffs and the action taken by

the BLM. *See, e.g., Kootenai Tribe of Idaho v. Veneman* 313 F.3d 1094, 1112 (9th Cir.2002). There, plaintiffs who had "ownership interests in land next to the national forests" had standing to challenge under NEPA a Roadless Rule being implemented in the national forest. The Circuit held that there was a "sufficient geographical nexus to the site of the challenged project that they may be expected to suffer whatever environmental consequences may result from implementation of the Roadless Rule." *Id.* (citing *Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975)). Here, the plaintiffs have a cognizable interest in how changes in adjacent land management may affect the existing HRWA lands and the wildlife that rely upon the area. *See* Dec. of Carol Wright at ¶ 3 (explaining that the "geographic area of interest for SMWC includes the entire Soda Mountain area, particularly the Cascade–Siskiyou National Monument, the Horseshoe Ranch Wildlife Area, and all the lands in the vicinity that contribute to improving the ecological health and aesthetic value of these areas.").

The declarations submitted by plaintiffs also demonstrate that they have an interest in expanded public recreation areas and thus may be affected by the impact the proposed amendment to the RRMP may have on the public land that is available in the broader area. *See* Dec. of Carol Wright at ¶¶ 11, 18; Dec. of Felice Pace at ¶¶ 5, 6 (stating that he approved of the 1993 RRMP "because it would clearly allow for more area in which to hike, and appreciate the backcountry" as well as "improve the overall ecological condition, and aesthetic quality of the area.").

█ Finally, defendants' contention that plaintiffs lack standing because the proposed amendment will not effect any changes on the public lands, appears to address a merits issue rather than a standing issue. Plaintiffs need not demonstrate, for the purpose of the standing analysis, that actual environmental harm will occur, that question is reserved for the case's merits. *See Hall v. Norton,* 266 F.3d 969, 976 –977 (9th Cir.2001); *Ecological Rights Foundation v. Pacific Lumber Co.,* 230 F.3d 1141, 1152 (9th Cir.2000) ("the causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs would succeed on the merits."). Rather, plaintiffs need only to show that some of their interests *might* be affected by the final agency action. *Hall v. Norton,* 266 F.3d 969, 976 –977 (9th Cir.2001) ("The purpose of the standing doctrine is to ensure that the plaintiff has a concrete dispute with the defendant, not that the plaintiff will ultimately prevail against the defendant.... Rather, [plaintiff] need only establish the reasonable probability of the challenged action's threat to his concrete interest."); *Desert Citizens Against Pollution v. Bisson,* 231 F.3d 1172, 1179 (2000). It is seems clear that a policy which would either eliminate or drastically reduce the ability of BLM to acquire additional lands would not at least have the possibility of impacting the interests discussed above.

This court raised on its own a standing question not advanced by the defendants. The court requested further briefing because it was unclear whether Congressional approval would be required for BLM to actually acquire adjacent land. If that had been the case, arguably the court would have been faced with a situation similar to *Department of Transportation v. Public Citizen,* 541 U.S. 752, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). There, the Supreme Court held that "where an agency has no ability to prevent a certain effect due to its

limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Id.* at 770, 124 S.Ct. 2204.

As the parties' further briefing demonstrates, the BLM may acquire land in the Horseshoe Ranch area through two different means. The first, purchase of land from a willing seller, requires that BLM seek funding from Congress. The second, and preferred approach, land exchanges, does not require congressional approval.

In a declaration, Charles Wright, the Supervisory Realty Specialist for the Redding Field Office, avers that "approximately 1,700 acres have been acquired through exchange" in Siskiyou County, including an exchange for 320 acres in the Horseshoe Ranch Management Area. Dec. of Charles Wright at 2. Wright set out eight primary steps (documents) required for a land exchange:

> 1) development of the proposal; 2) preparation of a feasibility report; 3) Agreement to Initiate Land Exchange; 4) Notice of Exchange Proposal (NOEP); 5) National Environmental Policy Act (NEPA) analysis and documentation and appraisal; 6) Notice of Decision; 7) Binding Agreement and appraisal update(s) as needed; 8) Title Transfer/Escrow.

*Id.* These exchanges may be "initiated by any person, corporation, or legal entity or may be initiated by the BLM." *Id.* Defen-

dants also note that "it would be possible for BLM to acquire land through donation or use of non-federal funding sources." Defs.' Supp. Br. at 3.

Plaintiffs have demonstrated a host of different concerns which may be impacted by the proposed amendment. The court is therefore satisfied that plaintiffs have demonstrated that they may suffer an "injury in fact" that is within the "zone of interests" that NEPA and FLPMA were designed to protect.

## B. THE CENTRAL DISPUTE

It appears to the court that central to the case is a dispute about what the proposed amendment would do if it was made final. BLM argues that they are merely consolidating the overall RRMP Horseshoe Ranch boundary with what they describe as the "BLM administrative boundary." [6] While acknowledging that this would eliminate the acquisition area from the Horseshoe Ranch boundary, defendants claim this will have no effect upon the opportunity for further acquisitions. They assert that "lands contiguous with the Horseshoe Ranch boundary would continue to be evaluated for acquisition" [7] although inclusions of those lands "would require a plan maintenance action." [8] Defs.' Br. at 4. For those lands not currently contiguous, however, it would take an RRMP amendment to add them to

---

**6.** Apparently, the "BLM administrative boundary" refers to the boundary between the public lands that are managed by BLM and those private lands which were part of the so called "acquisition area," but not otherwise managed by the BLM.

**7.** This contention clearly contradicts the EA. After stating that it will eliminate the acquisition area, the EA states that "BLM does not actively pursue new acquisitions in connection with HRWA." AR 00005.

**8.** The FLPMA regulations provide that maintenance on a management plan: "is not considered a plan amendment and shall not require the formal public involvement and interagency coordination process described under §§ 1610.2 and 1610.3 of this title or the preparation of an environmental assessment or environmental impact statement. Maintenance shall be documented in plans and supporting records." 43 C.F.R. § 1610.5–4.

Horseshoe Ranch.[9] It thus appears that lands not contiguous to the "administrative boundary" would not "continue to be evaluated for acquisition."

The plaintiffs characterize the amendment differently. First, they note that along with only looking to acquire lands "presently contiguous" to the existing public lands, BLM included a list of criteria that must be met which were not in the original 1993 RRAMP and which would make it less likely that land would be acquired. They further note that if the private lands contiguous to the existing public lands were acquired, then BLM would be prohibited from acquiring lands in the next layer without an amendment. Thus, plaintiffs believe that this amendment would make it less likely, if not impossible, for private lands to be acquired in the future.

The question at issue is whether the procedural change has the possibility of having on-the-ground impacts, either as direct, indirect or cumulative impacts on the greater Soda Mountain area. *See* 40 C.F.R. §§ 1502.16, 1508.7, 1508.8(a-b), 1508.25(c); *Idaho Sporting Congress, Inc. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir.2002)(requiring the consideration of direct, indirect, and cumulative impacts for an EA as well as an EIS); *Kern v. U.S. Bureau of Land Management,* 284 F.3d 1062, 1076 (9th Cir.2002).

## C. APPLICATION OF *NORTON v. SOUTHERN UTAH WILDERNESS ALLIANCE*

Defendants claim that the Supreme Court decision in *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004)(*SUWA* ), prohibits plaintiffs from obtaining the remedy they seek under FLPMA. They maintain

that *SUWA* held that ordinarily the goals set out in BLM management plans are not binding commitments that the agency can be forced to follow via the APA's grant of authority to the court to "compel action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

In *SUWA* the court was reviewing an action brought by environmental plaintiffs who sought to compel the BLM to better manage wilderness study areas in compliance with goals set out in the land use plan for that area. 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137. The Court concluded that FLPMA's general statutory directive that "BLM manage land in accordance with land use plans, and the regulatory requirement that authorizations and actions conform to those plans" when combined with a statement in the plan that BLM "will" take a certain action did not rise to the level of a binding commitment that could be compelled under the APA.

The Court explained that a statement in a land use plan that the agency "will" do something was not sufficient "at least absent clear indication of binding commitment in the terms of the plan." *Id.* at 69, 124 S.Ct. 2373. The Court observed, however that an action called for in a plan may be compelled "perhaps when language in the plan itself creates a commitment binding on the agency." *Id.* at 71, 124 S.Ct. 2373.

■ The present action is distinguished from *SUWA* in a number of ways. The first distinction is the relief sought in *SUWA* and the relief sought in the matter at bar. In *SUWA* the plaintiffs were seeking to compel agency action assertedly "unlawfully withheld or unreasonably de-

---

**9.** An amendment requires the preparation of either an EA or an EIS and a public involve-
ment procedure as set out in the regulations. 43 C.F.R. § 1610.5–5.

layed." See § 706(1).[10] Here, BLM has taken a final agency action which is independently reviewable under a separate section of the APA requiring the court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Rather than seeking to enforce what the Supreme Court describes as a "non-imperative" mandate under § 706(1), the plaintiffs are able to avail themselves of § 706(2)(A) because the BLM is amending the Redding Resource Management Plan, thus committing to a final decision.

A second ground distinguishes the matter at bar from *SUWA*. The Record of Decision adopting the 1993 RRMP states:

> The public impressed upon BLM the desire to consolidate public lands in areas with outstanding recreational opportunities and unusual or imperiled biological resources. Conversely, existing public lands with limited recreational potential and/or commonplace natural resources were identified for disposal. *This document represents BLM's commitment to these public desires and constitutes a compact with the public.*

*See* Excerpt of Record to Plaintiffs' Opening Brief at 70. (Emphasis added). Plaintiffs contend that this language is the binding commitment the Supreme Court said might be sufficient to allow for an enforcement action under § 706(1). The court must concur. If this language does not, despite its plain terms, constitute a commitment, then no language would suffice. It seems clear that the agency went out of its way to make clear it was committing to a certain process, and withdrawing from that "compact with the public" would appear to subject the agency to suit under § 706(1).

▮ Plaintiffs, however, sued under § 706(2)(A), thus suggesting that summary judgment under 706(1) may be inappropriate.[11] Nonetheless, the commitment is still significant since

> While the scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action. In reviewing that explanation, a court must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 30–31, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Thus, this court must determine whether all the "relevant factors" were considered when the agency decided to adopt the amendment under review. Nothing suggests the agency considered the commitment noted above in the matter under consideration. I turn now to whether the agency's action fails the arbitrary and capricious test in other ways as well.

## D. REVIEW UNDER NEPA AND THE APA

▮ While there is a presumption that a federal agency acted in good faith

---

**10.** This is also true for the case that defendants recently submitted. *The Wilderness Society v. Norton,* 434 F.3d 584 (D.C.Cir.2006).

**11.** *But see* Fed.R.Civ.P. 54(c) ("except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it rendered is entitled, even if the party has not demanded such relief in the party's pleadings."). Given the court's disposition, I need not consider whether plaintiffs are entitled to judgment under § 706(2)(A).

and that agency action is valid, this does not waive the court's obligation to ensure that the agency took a "hard look at the environmental consequences of its actions." *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir.1993); *Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Akiak Native Community v. U.S. Postal Service*, 213 F.3d 1140, 1146 (9th Cir.2000). The court is to defer to a "fully informed and well-considered agency decision, but [it] need not forgive a clear error of judgment." *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir.2001) (internal quotations omitted).

### E. FLPMA'S REQUIREMENTS

■ FLPMA regulations contain a plain requirement that an EA or an EIS must be prepared prior to the amendment of a Resource Management Plan. 43 C.F.R. § 1610.5–5. They further require that "[i]n all cases, the effect of the amendment on the plan shall be evaluated." *Id.* Thus, the applicable regulations require that the EA under review must not only examine the impact that the amendment may have on the Horseshoe Ranch area, but also must examine the greater impact that the amendment will have on the 1993 Redding Resource Management Plan.

Defendants argue that the action under review only continues the status quo and thus does not require full environmental review. Given FLPMA's specific mandate, however, the argument cannot prevail. At a minimum, an adequate environmental assessment is necessary to determine whether the amendment may have a significant environmental impact, *inter alia*, on the management plan.

### F. PURPOSE OF THE AMENDMENT

■ The NEPA regulations require that the EA prepared by the BLM "in-clude brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9. This purpose statement is an obvious place for the court to start when analyzing the adequacy of an environmental impact statement or an environmental assessment. It is from this statement that the agency, public, and, ultimately, the court may begin to judge whether the agency has fully analyzed the possible impacts of the action and reviewed a reasonable range of alternatives to that action.

Chapter II of the EA prepared by the BLM in the matter at bar is entitled "Purpose of the Proposed Amendment." AR 00120. Curiously, despite its title, the section never actually articulates the purpose; rather, the section explains what the document analyzes. It explains that "[t]his document analyzes a proposed change to the HRWA boundary along with three alternatives. Also addressed are the BLM land acquisition policy related to the HRWA and management of livestock grazing." *Id.*

Defendants' brief acknowledges that the need for the action is "not well articulated in the EA." Defs.' Br. at 13. Instead, the agency refers the court to the background information and the administrative record. *Id.* Unfortunately, the material referred to again does not make clear exactly what the agency was attempting to accomplish by the plan amendment. While the Bureau's reticence makes analysis more difficult, it does not render it impossible.

As noted in § I of this opinion, the Bureau action appears to have been prompted by a controversy which arose when BLM considered purchasing two sections of land which were offered for sale in the acquisition interest area. AR 00113.

Certain members of the public objected to the purchase and BLM withdrew from the sale. *Id.* The Siskiyou County Board of Supervisors then requested that the BLM amend the RRMP to reduce the size of the acquisition area that was set out in the 1993 Plan. *See* AR 00447–48. The Notice of Intent issued by BLM explains that it has received this letter, but merely states that it "will consider a proposal to amend the existing boundary of the Horseshoe Wildlife Area" without expanding upon why the amendment is necessary, or even desirable. AR 00435.

The failure of the agency to clearly define the purpose and scope of its action can be seen in the section entitled "Issues Considered, Then Dismissed from Full Analysis." AR 00121. There the agency explains that "for a variety of reasons many of the comments received from the public were beyond the scope of the analysis" and were therefore not considered fully. *Id.* Some of the comments "went beyond the geographic scope of the undertaking." Again, however, given the paucity of exposition, it is difficult to understand what that scope was. Here, again the failure to articulate the purpose and scope raises serious questions as to the adequacy of the agency's action. The agency dismissed some public comment from consideration on the grounds that it was beyond a geographic scope which was undefined, making analysis of the propriety of that conduct impossible.

 Along with helping to define the needed alternatives, the purpose section serves another important role in the NEPA scheme. NEPA is not a substantive statute, it is not designed to prohibit agencies from undertaking projects which may have a significant effect on the environment; it is designed, however, to ensure that the agency is candid about the action it is taking. *See Robertson v. Me-*thow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."). NEPA requires candor since its scheme contemplates public input into the decisionmaking process.

> "Congress wanted each federal agency spearheading a major federal project to put on the table, for the deciding agency's and for the public's view, a sufficiently detailed statement of environmental impacts and alternatives so as to permit informed decision making. The purpose of NEPA is to require disclosure of relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm."

*Lands Council v. Powell,* 395 F.3d 1019, 1027 (9th Cir.2005); 40 C.F.R. §§ 1500.1(b); 1500.2(d). In sum, NEPA forces agencies to explain what it is they seek to do, why they seek to do it, what the environmental impacts may be of their proposed action, and what alternatives might be available to the agency that might lessen environmental impact. Without a clear "what and why" statement, the public is kept in the dark. To put it differently, NEPA does not prohibit the government from taking actions for whatever political, ecological or economic reasons motivate the proposed action. It does, however, require a transparent process so that the public is informed about their choices.

 Defendants seek to cure the EA's inadequacy in defining the undertaking by arguing that the purpose for the proposed

amendment was "to clarify the public lands which are managed as Horseshoe Ranch." Defs. Br. at 13. Defendants' effort is without effect. It is established that the court is not permitted to accept post-hoc rationalizations. *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service,* 378 F.3d 1059, 1071 (9th Cir.2004) (rejecting a post-hoc rationalization of a Biological Opinion "because such explanations provide an inadequate basis for judicial review ...") (*citing Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *California v. Norton,* 311 F.3d 1162, 1176 (9th Cir.2002) (setting aside an agency's post hoc invocation of a categorical exclusion because it "does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made."). Moreover, as I now explain, even given the tendered rationale, the EA fails to meet NEPA standards.

## G. ALTERNATIVES

█ A discussion of alternatives is required in both an EIS and an EA. 40 C.F.R. § 1508.9(b); *Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1225 (9th Cir.1988). The agency here considered three different alternatives in the Draft EA. AR 00341–342. The first alternative reduced the boundaries of the HRWA to that of the original B.B. Miller Ranch. AR 00341. The second also reduced the boundaries, but by a smaller amount, still including sections 21, 22, and 34 along the western border, while also containing an acquisition interest in an area wider than that set out by the 1993 RRMP that was currently in place. AR 00342. The third, and final, alternative was the no-action alternative which would have kept the 1993 RRMP boundaries and acquisition policies. *Id.*

The selected alternative matched that of Alternative 2 but eliminated the acquisition area originally proposed in that alternative. AR 00124.

### 1. *What does the Alternatives Analysis Require?*

█ NEPA is designed to encourage the public agency to take into account the impacts of its decision, and the primary method that NEPA created to encourage this is through the consideration of alternatives. 42 U.S.C. § 4332(2)(E) (Agency is to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."); *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1207 (9th Cir.2004) ("The alternatives section is 'the heart of the environmental impact statement.'" (quoting 40 C.F.R. § 1502.14)). By examining both the environmental impacts of the desired path and the impacts of other reasonable alternatives, NEPA enables an agency, and the public it serves, to evaluate whether the government has other options it could take that might be less damaging to the natural environment. *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1180 (9th Cir.1990) ("[T]he touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.") (citing *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982)).

█ The range of alternatives to be considered and objectively evaluated is to be determined based upon those reasonably related to the purposes of the project. *Resources Limited,* 35 F.3d at 1307; *City of Angoon v. Hodel,* 803 F.2d 1016, 1021–22 (9th Cir.1986). The agency has no obligation to consider alternatives which are infeasible, or those whose effects are re-

mote and speculative such that they cannot be reasonably ascertained. *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. 1197. Nor does the agency have to consider every possible alternative, only a reasonable range sufficient to inform the public and the agency of the possible alternative options which could be selected. *Headwaters*, 914 F.2d at 1180–81. For those alternatives not selected for detailed study, the agency is required to "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

■ The court reviews the agency's selection and discussion of alternatives under a "rule of reason" "in judging whether the agency described those alternatives necessary to permit a reasoned choice." *City of Angoon*, 803 F.2d at 1020. The failure to adequately select and analyze a reasonable range of alternatives requires that an agency's action be set aside. *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir.1985) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

Plaintiffs claim that the BLM failed to consider a reasonable range of alternatives. Specifically, they raise two different purported failures in the agency's analysis.

First, they allege that "if the goal of the proposed RRAMP Amendment was to quell local concerns about the impacts of

federal land ownership on the local ranching economy then a reasonable alternative would have been to explore different kinds of property ownership [other] than outright purchase." Pls.' Br. at 31. By using conservation or public access easements they suggest that the agency could have met the concerns of the Board of Supervisors, without undertaking a significant change in the overall land acquisition policy.[12] Defendants fail to respond to this critique of the EA. Rather, the agency simply argues that the "alternatives considered by BLM were reasonably targeted to meet BLM's need to clarify the administrative boundary of Horseshoe Ranch." Defs.' Br. at 13. Defendant contends that the agency had "found that the acquisition interest area concept was confusing to the public" but it does not explain why the only option was to eliminate it entirely. *Id.* Moreover, given that the alternative also alters the methods for selecting property for acquisition, the action goes well beyond the tendered goal.

Moreover, as noted above, the agency has an obligation to identify, and briefly explain, which, if any, alternatives were considered for analysis but then rejected. 40 C.F.R. § 1502.14(a). Plaintiffs point to two different "Horseshoe Ranch RMP Amendment Meeting" minutes, from March 6, 2001 and March 13, 2001 which briefly ask the question "What about conservation easements?" AR 00394, 00392A4.[13] Although the question of conservation easements was raised, the EA

---

**12.** Plaintiffs' supplemental brief also, possibly inadvertently, identifies a second alternative that would have conflicted less with the concerns identified by Siskiyou County. The Board stated that it is "opposed to any expansion of land area under government control to the extent that such control undermines the tax base, or impedes the lifestyles of those landowners whose livelihoods remain dependant on the natural resource base." AR 00856. It appears that a policy of only con-

ducting land exchanges as opposed to outright purchases would still have allowed BLM to meet the goals set out in the 1993 RRMP, while not expanding federal land holdings, perhaps not undermining the tax base, or impeding the local lifestyle.

**13.** It is not clear whether this issue was raised in the public comments submitted on the EA.

does not mention them as an alternative that was considered but then rejected.

The other area that the plaintiffs suggest should have been considered as an alternative is the expansion of the HRWA boundary to include the Jenny Creek Area of Critical Environmental Concern and/or to include lands to the west of Interstate 5. They cite to a number of comments submitted which urged expansion of the area. AR 00121–22. It appears from the Final EA that BLM rejected these alternatives as being "beyond the geographic scope of the undertaking," perhaps meaning the HRWA and the immediate environs. AR 00122. This returns us to the issue of the failure to articulate the purpose and scope of the proposed action. As noted above, there is no way for the court to know, nor for the public to have known the purpose and scope of the proposed action. Accordingly, there was no way to know what a conclusion that something was beyond the geographic scope could mean.

Put directly, the instant alternatives analysis fails simply because it is not possible for the court to determine now, nor the public to determine then, what purpose BLM sought to accomplish. This becomes still more problematic since if, as the government now asserts, "clarification" was the goal, it appears that the agency undertook a radical approach for a simple problem. Clearly, the agency could have considered options which did not involve amendment at all, but rather focused on a public awareness campaign, an attempt to conduct land exchanges instead of purchases, or other less aggressive approaches.

■ Again, to prepare a proper EA an agency must first define what the project is, what its purpose is, and the scope of the undertaking. In this regard, it has been consistently held that "an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel–by–the–Sea v. United States Department of Transportation,* 123 F.3d 1142, 1155 (9th Cir.1997); *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1066 (9th Cir.1998) ("An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality.") (quoting *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.1991)).

Yet again, if the agency's purpose was something as simple as "clarifying" the administrative boundary of the Horseshoe Ranch, clearly the agency should take into account the alternatives adverted to above, and if rejected, the agency would be obligated to provide an explanation as to why they were rejected. A reasonable range of alternatives should be just that, a range of reasonable actions which might meet the goals of the agency by using different approaches which may reduce the environmental impacts of the agency's action.

## D. CUMULATIVE IMPACTS [14]

A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of

---

14. Defendants claim that plaintiffs have not plead the failure to consider cumulative impacts. On the contrary, paragraph 21 of the complaint identifies BLM's "failure to analyze fully the cumulative impacts" on the 1993 RRMP, and the plaintiffs' prayer for relief

also specifically requested that this court order BLM to prepare an EIS which "properly gives a 'hard look' at the ... cumulative impacts of reducing the boundaries of the HRWA ..."

who undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7; *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir.1998); *Kern v. Bureau of Land Management,* 284 F.3d 1062, 1075 (9th Cir.2002) (requiring a thorough consideration of cumulative impacts in the preparation of an EA).

■ It is established that the cumulative impacts analysis must include "some quantified or detailed information" since without such information it is not possible for the court or the public to be sure that the agency provided the hard look that is required of its review. *Neighbors of Cuddy Mountain v. Forest Service,* 137 F.3d 1372, 1379 (9th Cir.1998). If the agency did not present this detailed information and analysis it will be found to have violated NEPA unless it provides a convincing justification as to why more information could not be provided. *Ocean Advocates v. Army Corps of Engineers,* 402 F.3d 846, 868 (9th Cir.2005) (citing *Kern,* 284 F.3d at 1075 and *Muckleshoot Indian Tribe v. Forest Service,* 177 F.3d 800, 810 (9th Cir. 1999)). The Circuit has also explained that this analysis is particularly important in an EA. That is because so many more EAs than EISs are prepared, and thus there is a higher risk of cumulative impacts resulting from the many smaller decisions. *See Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 896 (9th Cir.2002); *Kern,* 284 F.3d at 1076.

■ The cumulative impacts analysis in the EA under consideration is a page long. It does not mention, nor discuss, any past, present, or future projects being conducted in the area that might result in a cumulative impact. There is no mention of whether this amendment might impact the overall goal of the RRMP "to consolidate public lands in areas with outstanding recreational opportunities and unusual or imperiled biological resources" while disposing of "existing public lands with limited recreational potential and/or commonplace natural resources." ROD for the 1993 RRMP, ER 070. Plaintiffs repeatedly note that the Bureau has disposed of 16,982 acres of public lands in Siskiyou County, while only acquiring 1,657 acres for expansion of the ecologically significant parcels identified in the RRMP. Defendants do not dispute this fact, yet the EA fails to analyze how this decision might have a cumulative impact on the ability of BLM to follow through on the compact it made with the public.

■ A cumulative impacts analysis should examine whether "the action is related to other actions with individually insignificant but cumulatively significant impacts." *Kern,* 284 F.3d at 1075. In this case there must, therefore, be a discussion of whether the proposed amendment, when combined with the various public land sales and acquisitions, might have a cumulatively significant impact.[15] The analysis should set out the past sales and acquisitions in the area and any which may be "reasonably foreseeable" and discuss how the current amendment of the plan, which makes it more difficult for the agency to acquire additional public lands, might result in a cumulative effect on the goals of the plan and on the environment as a whole.[16]

15. Plaintiffs point to two places in the record where a BLM decision to stop acquiring lands in the Shasta Wetlands was mentioned. If this is true, this is the sort of fact that should be examined in a cumulative impacts analysis. *See, e.g.,* AR 00448; AR 05041.

16. Plaintiffs point to a memo written by a BLM staff member after conducting a meet-

Defendants again rely on the unconvincing contention that "this administrative boundary change has no effects on the environment, and likewise does not have an incremental impact when added to other reasonably foreseeable action." Defs.' Br. at 14. First, even if the administrative change has no direct impact, it appears at least possible that there might be indirect impacts. NEPA requires that an EA contain a discussion of reasonably foreseeable future actions both within the study area as well as in the greater area. *Kern*, 284 F.3d at 1075; *Klamath–Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 994 (9th Cir.2004). Whatever else is true, it seems relatively clear that the proposed amendment removing the acquisition area will make it significantly more cumbersome for BLM to acquire lands that become available, particularly if they are not directly adjacent to the current public lands boundary. It therefore seems at least reasonably foreseeable that some of those lands no longer within the acquisition area may be sold to an owner who intends to develop the property, or to increase grazing on the land.

The defendants maintain that they included "an analysis of other reasonably foreseeable actions, namely the future potential for conversion of lands near Horseshoe Ranch from private to public." Defs.' Br. at 14.[17] However, plaintiffs' concern is the failure to convert land to public ownership, and the use of lands that remain in private ownership.

Plaintiffs also note as an asserted deficiency, that the cumulative impacts analysis was not undertaken for each alternative. They do not cite authority for the proposition that requires that the cumulative impacts be considered for each alternative. Certain decisions do refer to an EIS which discusses the cumulative impacts of each alternative, but they do not, in terms, make such discussion mandatory. Others seem to limit the discussion of cumulative effects to that of the proposed action. *See, e.g., Churchill County v. Norton*, 276 F.3d 1060, 1081 (9th Cir.2001) (finding that the "Fish and Wildlife Service has taken the requisite 'hard look' at the cumulative environmental impacts of the action alternatives and has not violated NEPA."); *but see Kern*, 284 F.3d at 1076 (9th Cir.2002) ("We have interpreted the regulations to require that the EIS consider the cumulative impact of the proposed action." citing *Edwardsen*, 268 F.3d at 786–90; *Neighbors of Cuddy Mountain*, 137 F.3d at 1378; *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990)); *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 810 (9th Cir. 1999) ("Detail is therefore required in describing the cumulative effects of a proposed action with other proposed actions.") In sum, the cases do not appear to require a cumulative impacts discussion for each alternative.

▪ The defendants argue that the EA is tiering from the EIS prepared for the RRMP. This contention is without substance. For an EA to be tiered off another environmental study, there must be

---

ing with one member of the plaintiff organizations. The memo notes that Mr. Pace (of one of the plaintiff organizations) and a number of other organizations and individuals were "deeply concerned" by the disproportionate disposal of public land in comparison with the acquisitions, and "our current rush to appease a small segment of the local popula-

tion and certain members of the Board of Supervisors by reducing the boundaries of Horseshoe Ranch." The staff member stated "I must admit, I could not argue spiritedly in our defense." AR 05041.

**17.** Defendants do not provide a citation to where in the EA this discussion is to be found.

some reference to the analysis conducted in the first document. It is true that the regulations on tiering provide that the EA "need only summarize the issues discussed in the broader statement and incorporate discussion from the broader statement by reference ..." 40 C.F.R. § 1502.20. Defendants, however, point to no reference or incorporation of the analysis from the EIS to suggest that this is anything more than another fatally defective post-hoc rationalization. Moreover, as plaintiffs contend, the current action is amending the plan for which the EIS was prepared. While this would not necessarily preclude tiering to some of the analysis, the EA would have to explain what altered circumstances justify the change.[18]

### E. BIOLOGICAL CONNECTIVITY CORRIDOR

██ Plaintiffs claim that the defendants had an obligation to consider the value of the Horseshoe Ranch Area as a biological connectivity corridor. Plaintiffs' opening brief plainly sets out three different places in the administrative process where the issue was brought to BLM's attention. First, the California Wilderness Coalition, and Felice Pace of KWFA raised the issue in the scoping comments. AR 04239, 04369–70. The issue was raised again in comments on the Draft EA by several different parties, including the SMWC, the World Wildlife Fund, and the KWFA. AR 01050–52, 10098–01101, 01102–03. Finally, it was raised in a face-to-face meeting with the BLM and Felice Pace.[19] The issue was also raised in ¶ 15 of the complaint which states that "[t]he HRWA provides vitally important biological connectivity functions and habitat values for wintering deer, elk, and other wildlife living in the area and moving between the nationally important Cascade–Siskiyou National Monument area and the Klamath River headwaters." [20]

Plaintiffs point to a portion of the Northwest Forest Plan amending the 1993 RRMP which "directs the BLM to evaluate carefully the values of the Soda Mountain area as a biological connectivity corridor and propose any additional management protection necessary, include a special designation, through the BLM resource management plan, to protect these

18. Plaintiffs' complaint that defendants included direct or indirect impacts in the cumulative impacts section has led to an extended debate over what is a cumulative impact, a direct impact, or a indirect one. While there are undoubtedly significant distinctions to be drawn between the type of impacts, there is no question that all of them must be discussed for a NEPA review document to be adequate. In any event, it is not clear whether the inclusion of various types of impacts in the cumulative impact discussion constitutes a NEPA violation. The fact that cumulative impacts were not discussed, however, is clearly a violation.

19. The memo prepared following the meeting by BLM staff specifically notes Mr. Pace's concerns on the "regional connectivity of the planning area to other major public land holdings to the east, west and north." AR 05040.

20. Defendants' primary response is to claim that the biological connectivity corridor concerns were not raised in the complaint and "must first be asserted in the administrative process." Defs.' Br. at 15. As noted in the text, the defendants are simply wrong. Indeed, this is constant and unjustified assertion of the defense which leads the court to worry about any assertion they make about the record. Besides being wrong on the facts, the Ninth Circuit has held that the agency cannot simply rely on environmental groups to bring new information to the attention of the government agency, whose responsibility it is to be aware of the environmental impact of its actions. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir.2000) (citing *City of Davis v. Coleman*, 521 F.2d 661, 667 (9th Cir.1975)).

values." Northwest Forest Plan at 30, ER 126. Given the discussion in the DEIS that was prepared for the creation of the Cascade Siskiyou Ecological Emphasis Area, BLM staff at the very least was charged with knowledge of the value of the area as a biological connectivity corridor and thus was required to consider its value as such. Any discussion of the area as a biological connectivity corridor should have included consideration of whether the amendment of the plan would, either directly or indirectly, impact the environmental vitality of the corridor.

The defendants do not suggest that they considered this issue. Instead, defendants again rely on the assertion that "the redrawing of the RMP Horseshoe Ranch boundary has no environmental consequences, either to the public lands of Horseshoe Ranch or the private lands surrounding it." Defs.' Br. at 15. This assertion cannot carry the day. FLPMA requires the agency to consider the impacts that any amendment has on the plan. 43 C.F.R. § 1610.5–5. An unsupported assertion of no impact fails to meet the regulatory requirement. At the very least, it was necessary that BLM consider whether the altered regimen for acquisition would affect acquisition and thereby affect the vitality of the corridor.

## F. FLPMA

██ Under the FLPMA, "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43

U.S.C.A. § 1732(b). The plaintiffs claim that this is the "substantive cornerstone of FLPMA's otherwise largely procedural framework as it intersects with NEPA." Pls.' Br. at 37. Section 1701 further states that it is

> the policy of the United States that … (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use …

43 U.S.C.A. § 1701. Plaintiffs claim that these policy statements, along with the broader management purposes set out in the 1993 RRMP require that BLM analyze whether the proposed amendment will create unnecessary or undue degradation of the public lands.[21]

They point to one area in particular in the proposed plan which they believe demonstrates possible unnecessary or undue degradation, or at the very least a contradiction in management policy. The selected alternative allows for grazing on sections 21, 22, and 34 of the HRWA and not on the rest of the public land. The 1993 RRMP asserted that "[a]ll Animal Unit Months (AUMs) are available for wildlife unless BLM determines that domestic livestock grazing management would be beneficial to enhance wildlife habitat."[22]

---

**21.** Given *SUWA*, it is important to recognize the narrow nature of plaintiffs' claim. They do not argue that a particular result is mandated, they merely argue that an analysis is mandated.

**22.** Plaintiffs maintain that the RRMP provided that grazing would only be allowed in the

Horseshoe Ranch Wildlife Area if it was found to be beneficial to deer habitat. The court assumes the language noted in the text is the language they rely on for this proposition, although the provision is not limited to deer.

RRMP at 34, ER 077. BLM has not provided any explanation of why grazing would be beneficial in the specified areas but not in the rest of the HRWA, which the EA states has the same ecological properties.

Plaintiffs further note that the management policy for Alternative 1 and the selected alternative would have the specified sections managed under the same policy of multiple use. However, the EA states that management under Alternative 1 could result in "fewer winter deer, reduced vigor, and less fawn survival and recruitment." The same management policy under the selected alternative, however, does not result in any finding of a significant impact, or any impact for that matter.

Plaintiffs maintain that the policy of allowing grazing without a finding of benefit to wildlife, violates NEPA's "hard look" requirement, and violates the unnecessary or undue degradation standard of FLPMA. They also claim that BLM failed to provide a rational connection between the facts found and the decision made. *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1065 (9th Cir.2004).

Defendants do not respond to these contentions. Rather, they again argue that the amendment does not cause any on the ground changes to the management of Horseshoe Ranch. Even if this were true, it does not explain the contradiction in the conclusions noted above. With regards to the unnecessary or undue degradation standard, the defendants are correct that the standard only applies to the public lands. The decision at bar, at the very least appears to make it more difficult to acquire private lands. That difficulty while it may not have a direct effect on the public lands, may, as discussed above, have an indirect effect. Accordingly, the Bureau is obligated to consider in its EA whether there will be any unnecessary or undue degradation to the lands as a result of this policy change.

Plaintiffs point to an additional contradiction in the EA. The introductory section of the Final EA states the following:

> BLM has publicly expressed its intention to balance the approximately 17,000 acres of public land transferred from Federal ownership in Siskiyou County since 1993 by acquisitions of environmentally sensitive lands in other parts of the County. For this reason, and in response to a 1999 request by Siskiyou County, BLM eliminates the extensive area identified in alternatives 2 and 3 for potential federal acquisition of private lands. BLM does not actively pursue new acquisitions in connection with HRWA. However, the amendment continues to allow for acquisition from willing sellers of private lands contiguous to HRWA that also meet the criteria for deer winter range.

AR 00005. Plaintiffs describe this as an Orwellian statement because it states that it will balance the significant amount of public land disposed of in the County by removing a significant acquisition area from further consideration.[23] Defendants, again, do not respond.

The court must find that, overall, the EA fails to draw rational connections between the facts found and the decision made. *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997); 5 U.S.C. § 706(2)(A). Plaintiffs have pointed to two plain internal contradictions in the EA, neither of which the defendants have chosen to respond to. This is com-

---

**23.** The last two sentences are also difficult to follow. On the one hand, the BLM says that it will no longer pursue acquisitions, but then say that the amendment continues to allow for more acquisitions.

pounded by the absence of a clear purpose statement in the EA. In order to adequately meet the requirements of NEPA and FLPMA, the Bureau needs to undertake a more considered, transparent, and in-depth review of the potential environmental impacts of the proposed amendment.

## G. FEDERAL ADVISORY COMMITTEE ACT

Defendants' motion for summary judgment seeks to dismiss plaintiffs' fourth claim for relief which alleges a failure to include all interested parties in the initial scoping process for the RRMP amendment. Plaintiffs have not raised the issue in their own motion nor have they responded to it in their reply and opposition. It appears, thus, that plaintiffs have waived this claim and it therefore will be dismissed.

## IV.

### CONCLUSIONS AND ORDERS

The defendants have failed to conduct adequate environmental review as required by FLPMA and NEPA. Therefore, summary judgment will be granted for plaintiffs and denied for defendants on the question of compliance with FLPMA and NEPA. BLM shall return to the drawing board and prepare either an adequate EA or a complete EIS which contains a clear statement of purpose and need, which fully analyzes the direct, indirect and cumulative impacts of the amendment, and which examines a complete set of reasonable alternatives which are tailored to meet the goals set out in the purpose and need statement.

The Clerk is directed to ENTER judgment and CLOSE the case.

IT IS SO ORDERED.