**BOB MARSHALL ALLIANCE, et al.,**
**Plaintiffs–Appellees,**

v.

**Donald P. HODEL, Secretary of the Interior,\* et al., Defendants,**

**and**

**Paul C. Kohlman and Ann E. Kohlman, Defendants–Appellants.**

**BOB MARSHALL ALLIANCE, et al.,**
**Plaintiffs–Appellees,**

v.

**Donald P. HODEL, Secretary of the Interior,\* et al., Defendants–Appellants,**

**and**

**Placid Oil Company, Defendant–Intervenor,**

**and**

**Paul C. Kohlman and Ann E. Kohlman, Defendants.**

Nos. 86–4014, 86–4019.

United States Court of Appeals, Ninth Circuit.

Argued Aug. 6, 1987.

Submitted June 16, 1988.

Decided Aug. 1, 1988.

---

\* Donald P. Hodel is substituted for his predecessor, James Watt, as Secretary of the Interior.

Fed.R.App.P. 43(c)(1).

J. Carol Williams, U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

Constance E. Brooks, Mountain States Legal Foundation, Denver, Colo., for defendant-appellant Paul C. Kohlman.

Stephan C. Volker, Sierra Club Legal Defense Fund, San Francisco, Cal., for plaintiffs-appellees.

Before CANBY, REINHARDT and BEEZER, Circuit Judges.

REINHARDT, Circuit Judge:

This appeal involves the issuance of oil and gas leases on the area known as Deep Creek, located in Montana's Lewis and Clark National Forest. The Bob Marshall Alliance and the Wilderness Society (collectively "Marshall Alliance") brought suit against several federal agencies and the

lessees,[1] challenging issuance of the leases on several statutory grounds. 685 F.Supp. 1514.

First, Marshall Alliance alleges that issuance of the leases violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* (1982). NEPA mandates the preparation of an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). In order to determine whether an EIS is required, the federal agency concerned prepares an environmental assessment. 40 C.F.R. § 1508.9 (1987). Based on that assessment the agency may conclude that the action will not significantly affect the environment and issue a "Finding of No Significant Impact" ("FONSI") in lieu of an EIS. *Id.* § 1508.13. We have held that an EIS is required at the point where a federal agency makes an "irreversible and irretrievable commitment of the availability of resources." *Environmental Defense Fund, Inc. v. Andrus,* 596 F.2d 848, 852 (9th Cir.1979). Marshall Alliance contends that, because the leases in question here were issued without an EIS, the requirements of NEPA were not met.

Second, NEPA also requires that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (1982); *see* 40 C.F.R. § 1508.9(b) (1987) (environmental assessment must include discussion of alternatives). Marshall Alliance contends that the alternative of not issuing the Deep Creek leases—the "no action alternative"—was not considered adequately, in violation of NEPA's mandate.

Marshall Alliance's third claim involves the Endangered Species Act of 1973 (the "ESA"), 16 U.S.C. §§ 1531 *et seq.* (1982). The ESA establishes a consultation process by which federal agencies ensure that their actions will not jeopardize a threatened or endangered species or damage the habitat of such a species. *Id.* § 1536(a)(2). The statute requires preparation of a biological opinion based on "the best scientific and commercial data available" whenever a threatened or endangered species is present in the area of a proposed action. *Id.* §§ 1536(a)(2), (b). If the opinion concludes that the action would jeopardize a protected species, the action must be modified. *Id.* Marshall Alliance alleges that the requirements of the ESA were not met before the Deep Creek leases were issued.

Following our recent opinion in *Conner v. Burford,* 836 F.2d 1521 (9th Cir.1988), we hold that the defendant agencies violated the provisions of both NEPA and the ESA.

## FACTS AND PROCEEDINGS BELOW

The Deep Creek Further Planning Area ("Deep Creek") comprises about 42,000 acres of .wild, mountainous terrain. It is bounded to the west by three designated wilderness areas and to the east by three wilderness study areas. Deep Creek offers spectacular scenery and recreational opportunities for fishers, hikers, and outdoors enthusiasts of all kinds. Perhaps most important, it is home to a large and unique wildlife population. Deep Creek is an important refuge for four threatened or endangered species: the grizzly bear, the gray wolf, the peregrine falcon, and the bald eagle.[2] In addition, bighorn sheep, elk, mule and white-tailed deer, black bear, moose, mountain goat and mountain lion abound in the area. At the same time, Deep Creek offers opportunities for resource developers. The area is located in the Overthrust Belt, an extensive geologic zone in which major discoveries of oil and natural gas have already been made.

In 1977, the United States Forest Service began reviewing national forest lands to determine which areas should be recom-

---

**1.** One of the lessees, Paul C. Kohlman, remains a party to this appeal.

**2.** Appellees claim that Deep Creek, together with the contiguous wilderness areas, contains a substantial portion of the entire grizzly bear population of the lower 48 states.

mended for wilderness designation. Through this Roadless Area Review and Evaluation ("RARE II") process, the Forest Service classified areas as either wilderness, nonwilderness, or further planning. Those lands classified as further planning areas are open for all uses permitted under applicable land use plans—including oil and gas exploration—pending the development of management plans which will consider whether to recommend the area for inclusion in the wilderness system. *See California v. Block,* 690 F.2d 753, 758 (9th Cir.1982). In order to preserve the possibility of wilderness designation, the final RARE II environmental impact statement declared that development activities that might reduce the land's wilderness potential are prohibited in further planning areas.

The RARE II evaluation awarded Deep Creek the highest possible wilderness rating—a "perfect score" on the Wilderness Attribute Rating System. Deep Creek also received a very high rating on its potential for natural gas discovery. Because Deep Creek possesses both highly favorable wilderness characteristics and a high potential for the development of natural gas resources, it was classified as a further planning area.

Following this designation, the Bureau of Land Management ("BLM") of the Interior Department received sixteen applications for oil and gas leases on Deep Creek. The Forest Service prepared an environmental assessment of Deep Creek and concluded that such leasing would have no significant effect on the quality of the human environment. This FONSI absolved the agencies of the need to prepare an EIS on the sale of the leases. With regard to the requirements of the ESA, the Forest Service requested formal consultation with the Fish and Wildlife Service ("FWS") regarding the effects of the lease issuance on the threatened and endangered species in Deep Creek. The biological opinion issued by FWS concluded that the sale of leases in itself would not threaten the species in question, but found that there was insufficient information available to issue a com-prehensive biological opinion beyond the initial leasing phase.

Beginning in January 1982, BLM issued the sixteen leases for which applications had been received; subsequently BLM issued three simultaneous oil and gas leases by lottery. Collectively these leases cover all of the land within Deep Creek. Some of the leases contain "no surface occupancy" ("NSO") stipulations, which prohibit the lessee from engaging in any surface-disturbing activity. Others contain various stipulations that allow the Secretary of the Interior to impose reasonable conditions on surface-disturbing activity. All of the leases contain "threatened or endangered species stipulations," which state that surface-disturbing activity may be restricted if it would have a detrimental effect on endangered or threatened species or their habitats.

In February 1982, following a series of administrative appeals, Marshall Alliance brought this action in federal district court to challenge the issuance of the Deep Creek leases. Specifically, Marshall Alliance alleged that NEPA required preparation of an EIS prior to the issuance of the leases; that the defendant agencies failed to consider the alternative of not issuing leases, again in violation of NEPA; that the leases would impair the wilderness character of Deep Creek in violation of Forest Service regulations; and that the consultation process mandated by the ESA had not taken place.

The district court awarded summary judgment for Marshall Alliance. The court held that the agencies violated NEPA and Forest Service regulations by failing to prepare an EIS for the Deep Creek leases, and that the stipulations (both NSO and non-NSO) were insufficient to comply with NEPA's mandate. The court also held that the agencies violated NEPA by failing to give meaningful consideration to the no-leasing alternative. Finally, the court held that the effects of leasing on threatened and endangered species in Deep Creek had not been properly assessed, as the ESA requires. The court set aside the actions of the agencies in issuing the leases and

enjoined the agencies from issuing any leases on Deep Creek pending compliance with NEPA, the ESA, and agency regulations.

The defendants appeal from the district court's decision. They contend that both NEPA and the ESA are satisfied by a process of "staged consultation" under which the effects of surface-disturbing activity are analyzed as specific activities are actually proposed. They argue that ongoing NEPA evaluation and ESA consultation, combined with the various stipulations in the leases, will protect environmental interests as fully as the two statutes require.

## DISCUSSION

### I. The Decision in *Conner*

Some of the issues raised in this appeal are disposed of by our recent opinion in *Conner v. Burford*, 836 F.2d 1521 (9th Cir.1988). That case also involved the sale of oil and gas leases on national forest lands in Montana. As in the instant case, the leases were issued without preparation of an EIS. Some of the leases contained NSO stipulations and some did not. Again as in the instant case, a comprehensive biological opinion was not prepared prior to issuing the leases. The plaintiffs challenged the lease sale, claiming violations of NEPA and the ESA.

On the NEPA claims, we held that the sale of an "NSO lease"—defined as a lease that "absolutely forbid[s] the lessee from occupying or using the surface of the leased land unless a modification of the NSO stipulation is specifically approved by the BLM"—does *not* constitute the "go/no go point of commitment at which an EIS is required." *Id.* at 1527–29. However, we held that "non-NSO leases"—that is, leases which "do not reserve to the government the absolute right to prevent all surface-disturbing activity"—cannot be sold without preparation of an EIS, because non-NSO leases represent an irretrievable commitment of resources. *Id.* at 1529–32.

With regard to the ESA claims, we held that the ESA requires the FWS to consider

*all* phases of the agency action—including post-leasing activities as well as the lease sale itself—in its biological opinion. Incomplete information, we stated, "does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available." *Id.* at 1534. The FWS "violated the ESA by failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action." *Id.* at 1535. We further held that staged consultation was not sufficient to comply with the ESA and that stipulations in the leases could not substitute for comprehensive biological opinions. *Id.* at 1535–38.

### II. Preparation of an EIS

■ It is clear from our decision in *Conner* that sale of the Deep Creek leases required preparation of an EIS unless the lease "absolutely prohibits surface disturbance in the absence of specific government approval." *Id.* at 1527 n. 15; *see also Sierra Club v. Peterson*, 717 F.2d 1409 (D.C.Cir.1983). No EIS was prepared on any of the leases. Following *Conner*, we affirm the district court's holding that the agencies violated NEPA by failing to prepare an EIS for the non-NSO leases, and reverse the district court's judgment insofar as it requires preparation of an EIS for the sale of NSO leases.

As in *Conner*, we cannot determine from the record which of the Deep Creek leases protect absolutely against surface-disturbing activity. Four of the leases apparently contain NSO stipulations covering the entire leased acreage; some of the others contain NSO stipulations covering part of the leased acreage; some leases contain both NSO stipulations and less strict stipulations regarding regulation of surface-disturbing activity. On remand, the district court may need to determine which of the Deep Creek leases are NSO leases—that is, leases in which "the language of the stipulation, construed with the rest of the lease, absolutely prohibits surface disturbance in

the absence of specific government approval." *Conner*, 836 F.2d at 1527 n. 15.[3]

### III. The ESA Claims

■ As in *Conner*, the Deep Creek leases were issued without preparation of a comprehensive biological opinion as to the effects of the leases *and* of all post-leasing activities on threatened and endangered species. This violated the ESA. The threatened and endangered species stipulations in the leases "cannot be substituted for comprehensive biological opinions." *Id.* at 1538. We therefore affirm the district court's decision that the defendant agencies violated the ESA, and hold that the statute requires the FWS to prepare a biological opinion assessing the impact of the issuance of the Deep Creek leases and of all post-leasing activities on threatened and endangered species.

### IV. The No Action Alternative

Finally, Marshall Alliance argues that the defendant agencies violated NEPA by failing to give adequate consideration to the no action alternative—that is, the option of not issuing any oil and gas leases on Deep Creek. The Alliance contends that the agencies abandoned the no action alternative because they believed that declining to issue the leases based on wilderness considerations alone would violate the Wilderness Act, 16 U.S.C. §§ 1131 *et seq.* (1982), and further argues that the agencies' construction of the law is erroneous. Because the agencies themselves have not raised this argument on appeal, we need not consider it here.

■ Nor do the agencies contend on appeal that they considered the no action alternative. Rather, they argue that because the NSO stipulations preclude any surface-disturbing activity on Deep Creek, the NSO leases do not create any "unre-

solved conflicts" that would trigger NEPA's consideration of alternatives requirement. We observe that the agencies have apparently abandoned any contention that issuance of non-NSO leases does not require consideration of the no action alternative. Thus, only one question is raised by the agencies' contentions on appeal: whether the no action alternative should have been considered before the NSO leases were issued. We answer that question in the affirmative.

NEPA requires that federal agencies consider alternatives to recommended actions whenever those actions "involve[ ] unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (1982). The goal of the statute is to ensure "that federal agencies infuse in project planning a thorough consideration of environmental values." *Conner*, 836 F.2d at 1532. The consideration of alternatives requirement furthers that goal by guaranteeing that agency decisionmakers "[have] before [them] and take[ ] into proper account all possible approaches to a particular project (*including total abandonment of the project*) which would alter the environmental impact and the cost-benefit balance." *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 449 F.2d 1109, 1114 (D.C.Cir.1971) (emphasis added). NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decisionmaking and provides evidence that the mandated decisionmaking process has actually taken place. *Id.* Informed and meaningful consideration of alternatives—including the no action alternative—is thus an integral part of the statutory scheme.

■ Moreover, consideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger

---

**3.** Marshall Alliance contends that the NSO stipulations in the Deep Creek leases were conditioned on the fact that the surrounding lands were leased for surface occupancy and directional drilling was therefore possible. The Alliance argues that the NSO stipulations affect only that portion of the leased land that lies within a half-mile of areas where directional

drilling would be allowed and that, if surface occupancy is disallowed on the surrounding lands, the NSO stipulations are completely ineffective. We leave this issue, which involves construction of the leases and the language of the stipulations, for the district court's consideration.

the EIS process. This is reflected in the structure of the statute: while an EIS must also include alternatives to the proposed action, 42 U.S.C. § 4332(2)(C)(iii) (1982), the consideration of alternatives requirement is contained in a separate subsection of the statute and therefore constitutes an independent requirement. *See id.* § 4332(2)(E). The language and effect of the two subsections also indicate that the consideration of alternatives requirement is of wider scope than the EIS requirement. The former applies whenever an action involves conflicts, while the latter does not come into play unless the action will have significant environmental effects. An EIS is required where there has been an irretrievable commitment of resources; but unresolved conflicts as to the proper use of available resources may exist well before that point. Thus the consideration of alternatives requirement is both independent of, and broader than, the EIS requirement. *See City of New York v. United States Department of Transportation,* 715 F.2d 732, 742 (2d Cir.1983), *cert. denied,* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1135 (5th Cir.1974); *California v. Bergland,* 483 F.Supp. 465, 488 (E.D.Cal.1980), *aff'd sub nom. California v. Block,* 690 F.2d 753 (9th Cir.1982). In short, any proposed federal action involving unresolved conflicts as to the proper use of resources triggers NEPA's consideration of alternatives requirement, whether or not an EIS is also required.

Issuance of the Deep Creek leases involves such conflicts. Indeed, this case presents a useful illustration of the need for an independent consideration of alternatives requirement. The Deep Creek NSO leases do not represent an irretrievable commitment of resources, and therefore their sale does not require preparation of

an EIS. *Conner,* 836 F.2d at 1529. Nevertheless, the sale of Deep Creek leases—both NSO *and* non-NSO—involves conflicts as to the present and future uses of Deep Creek, because the issuance of the leases may allow or lead to other activities that would affect Deep Creek's suitability for wilderness designation. As we made clear in *Conner,* the sale of leases cannot be divorced from post-leasing exploration, development, and production. *Id.* at 1534; *cf. Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985) (EIS must consider cumulative environmental effects of agency action). Because the Deep Creek lease sale opens the door to potentially harmful post-leasing activity, it "involves unresolved conflicts concerning alternative uses of available resources"; NEPA therefore requires that alternatives—including the no-leasing option—be given full and meaningful consideration.[4]

■ While the defendant agencies do not argue that the no action alternative was weighed by the Forest Service, defendant Kohlman asserts that such consideration was in fact afforded to the full extent required by NEPA. Kohlman argues that if the agencies had either denied or deferred action on the Deep Creek lease applications, their action would have constituted an illegal administrative "withdrawal" of Deep Creek from mineral leasing.[5] Therefore, he contends, further consideration of these options was not required. We reject this argument. "Withdrawal" of public lands requires a formal procedure which, for parcels exceeding 5000 acres, includes congressional approval; the land is effectively segregated from the operation of public land laws for a period of up to 20 years. Federal Land Policy and Management Act, 43 U.S.C. § 1714 (1982). We fail to see how a decision not to issue oil and gas leases on Deep Creek would be equiva-

---

**4.** We observe that, by definition, the no-leasing option is no longer viable once the leases have been issued; it must be considered before any action is taken or the statutory mandate becomes ineffective.

**5.** The Forest Service apparently was of the same view with regard to deferring action on the

lease applications. The alternative of denying all leases was rejected as "unviable" on other grounds not raised by the appellants. United States Forest Service, *Environmental Assessment —Oil and Gas Leasing: Deep Creek & Reservoir North Rare II Further Planning Areas* 46–47 (rev. Jan. 1981).

lent to a formal withdrawal. Kohlman cites only one case, *Mountain States Legal Foundation v. Andrus,* 499 F.Supp. 383 (D.Wyo.1980), as authority for the proposition that deferring action on oil and gas lease applications can constitute an unlawful administrative withdrawal. *Mountain States* is not binding on us and we do not find its reasoning persuasive. In that case, the court concluded that the Interior and Agriculture Departments had illegally withdrawn over a million acres of land because they had failed to act on oil and gas lease applications and had thereby removed the land from the operation of the Mineral Leasing Act of 1920. *Id.* at 391. Yet as the court acknowledged, the Mineral Leasing Act gives the Interior Secretary discretion to determine which lands are to be leased under the statute. 30 U.S.C. § 226(a) (1982); *see Mountain States,* 499 F.Supp. at 391–92. We have held that the Mineral Leasing Act "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract." *Burglin v. Morton,* 527 F.2d 486, 488 (9th Cir.1975) (citing *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965)), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976). Thus refusing to issue the Deep Creek leases, far from removing Deep Creek from the operation of the mineral leasing law, would constitute a legitimate exercise of the discretion granted to the Interior Secretary under that statute. We affirm the district court's holding that the agencies failed to give the no action alternative meaningful consideration and thereby violated NEPA.

## CONCLUSION

The defendant agencies violated NEPA by issuing non-NSO leases on Deep Creek without preparation of an EIS, and by issuing any leases at all on Deep Creek without adequate consideration of the no action alternative. They violated the ESA by issuing the leases without preparation of a comprehensive biological opinion which assesses the effects of leasing and post-leasing activities on threatened and endangered species in the Deep Creek area.

The proper remedy for substantial procedural violations of NEPA and the ESA is an injunction. *Thomas,* 753 F.2d at 764. The district court's opinion declared that "the actions of the defendant agencies, allowing the issuance of oil and gas leases in the Deep Creek Area, are HEREBY SET ASIDE. The defendant agencies are enjoined from making further recommendations to lease and issuing leases pending compliance with NEPA, agency regulations, and the ESA." The parties have raised some question as to the effect and appropriateness of the district court's order. In *Conner,* we found similar language to be unclear and undertook to clarify the order. 836 F.2d at 1541. Here we face an additional factor not present in *Conner,* namely the agencies' failure to consider the no action alternative. Under these circumstances we prefer to remand the action and allow the district court the first opportunity to clarify its order and to determine the specific steps to be taken with respect to the various Deep Creek leases. In doing so, the district court shall consider our decisions in this case and in *Conner,* as well as our recent opinions in *Northern Cheyenne Tribe v. Hodel,* 842 F.2d 224 (9th Cir.1988), and *Save the Yaak Committee v. Block,* 840 F.2d 714 (9th Cir.1988).

Pending the district court's clarification of its order, we enjoin all activities on Deep Creek lands conducted under the provisions of the Deep Creek oil and gas leases, and enjoin the sale of any additional leases on Deep Creek, until all statutory requirements are met.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.