**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,**

v.

**Donald C. WINTER, Secretary of the Navy, et al., Defendants.**

No. 8:07–cv–00335–FMC–FMOx.

United States District Court, C.D. California.

Aug. 7, 2007.

See also 508 F.3d 885.

Alan J. Heinrich, Gregory Alan Fayer, Richard B. Kendall, Irell & Manella, Los Angeles, CA, Andrew Elsas Wetzler, Cara

Ann Horowitz, Joel R. Reynolds, Natural Resources Defense Council, Santa Monica, CA, for Plaintiffs.

Assistant U.S. Attorney SA—CV, Santa Ana Branch—Civil Div., Santa Ana, CA, Charles R. Shockey, A.U.S.A. Office of the U.S. Attorney, Guillermo Montero, Luther L. Hajek, U.S. Department of Justice, Washington, DC, Michael R. Eitel, U.S. Department of Justice, Environment and Natural Resources Division—Wildlife Section, Denver, CO, George S. Cardona, A.U.S.A.—Office of U.S. Attorney, Los Angeles, CA, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR STAY AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

FLORENCE–MARIE COOPER, Judge.

This matter is before the Court on Defendants' Motion to Dismiss or Stay (docket no. 14) and Plaintiffs' Motion for Preliminary Injunction (docket no. 21), filed June 22, 2007. The Court has read and considered the moving, opposition, and reply documents submitted in connection with these motions. The matter was heard on August 6, 2007, at which time the parties were in receipt of the Court's Tentative Order. For the reasons and in the manner set forth below, the Court hereby **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Preliminary Injunction and **DENIES** Defendants' Motion to Dismiss or Stay.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This litigation arises out of the United States Navy's proposed use of mid-frequency active (MFA) sonar, a tool that has proven far more effective at detecting modern quiet-running diesel electric submarines than passive sonar. (Decl. of Capt. Martin May (May Decl.) ¶¶ 8–10.) MFA sonar, which generates underwater sound at extreme pressure levels, has the unfortunate side effect of harming marine life, up to and including causing death. (*See, e.g.,* Decl. of Thomas Jefferson (Jefferson Decl.) ¶ 4 and sources cited therein.) The Navy plans to use MFA sonar during fourteen large-scale training exercises (involving various ships, submarines, amphibious vehicles, rotary and fixed-wing aircraft, and live ordinance) off the coast of southern California between February 2007 and January 2009. (Decl. of Luther Hajek (Hajek Decl.), Ex. 1 at 2–1 to 2–24.) The Navy's own Environmental Assessment (EA) reports that these activities, comprised of Composite Training Unit Exercises (COMPTUEX) and Joint Task Force Exercises (JTFEX), will result in approximately 170,000 "takes"[1] of marine mammals. (*Id.* at 4–46 to 4–47.) These takes are predominantly "Level B harassment exposures," in which marine mammals would be subjected to sound levels of between 170 and 195 decibels,[2] but also include approximately 8,000 exposures powerful enough to cause a temporary threshold shift in the affected mammals' sense of hearing and an additional 466

---

1. The term "take," as defined in the Endangered Species Act, means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

2. Decibels are a logarithmic measurement, such that an increase of 10 dB is equivalent to

a tenfold increase in acoustic energy. To put these sound levels in perspective, OSHA requires hearing protection to be used where workers are exposed to a sound level of 90 dB for eight hours or 110 dB for as little as thirty minutes. 29 C.F.R. § 1910.95(a).

instances of permanent injury to beaked and ziphiid whales. (*Id.*)

Despite these findings, the Navy concluded that its JTFEX and COMPTUEX exercises in the Southern California Operating Area (SOCAL) would not cause a significant impact on the environment and on that basis decided that the National Environmental Policy Act (NEPA) did not require it to prepare an Environmental Impact Statement (EIS). In addition, the Navy determined that the use of MFA sonar would not affect natural resources in California's coastal zone and therefore submitted a "consistency determination" (CD) to the California Coastal Commission (CCC) for the exercises that did not take the planned use of MFA sonar into account. It also refused to adopt the mitigation measures the CCC subsequently determined were necessary for the Navy's actions to comply with the California Coastal Management Program (CCMP). (*See* Decl. of Cara Horowitz (Horowitz Decl.), Ex. 67 at 9.)

On March 22, 2007, Plaintiffs, five environmental protection groups and Jean–Michel Cousteau, filed this action against Defendants, which include the United States Department of the Navy and the National Marine Fisheries Service (NMFS), seeking declaratory and injunctive relief for Defendants' violations of NEPA, the Endangered Species Act (ESA), the Administrative Procedures Act (APA), and the Coastal Zone Management Act (CZMA). On June 22, 2007, Plaintiffs moved for a preliminary injunction enjoining the Navy's use of MFA sonar during the SOCAL exercises "until the Navy adopts mitigation measures that would substantially lessen the likelihood of serious injury and death to marine life." That same day, Defendants filed a Motion to Dismiss or Stay.

## DISCUSSION

### I. Defendants' Motion to Dismiss or Stay

■ Defendants have asked the Court, "for purposes of judicial economy," to exercise its inherent power to manage its docket by dismissing this action, which it argues is duplicative of *Natural Res. Def. Council v. Winter*, CV 05–7513 FMC (FMOx) (hereinafter *NRDC I* ), or staying the action pending resolution of *NRDC I* and *California Coastal Comm'n v. U.S. Dep't of the Navy*, CV 07–1899 FMC (FMOx). The Court finds that the instant case does not constitute "vexatious litigation," as Defendants argue, and declines to exercise its broad discretion in the service of judicial economy by dismissing or staying this subsequently filed action that involves additional parties, asserts new legal claims, and is premised on new factual developments, particularly where a dismissal or stay would likely preclude any review of the claims on their merits until after completion of the challenged activities, which Plaintiffs contend will cause irreparable harm. Accordingly, the Court denies Defendants' Motion to Dismiss or Stay.

### II. Plaintiffs' Motion for Preliminary Injunction

■ Plaintiffs have asked the Court to issue a preliminary injunction prohibiting the Navy from using MFA sonar during the remaining eleven SOCAL exercises. "A preliminary injunction may issue when the moving party demonstrates either '(1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor.' " *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 906 (9th Cir.2007) (quoting *A & M Records v. Napster, Inc.*, 239 F.3d 1004,

1013 (9th Cir.2001)); *see also Cmty. House, Inc. v. City of Boise,* 468 F.3d 1118, 1123 (9th Cir.2006). "These two options represent extremes on a single continuum: 'the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor.'" *Lands Council v. Martin,* 479 F.3d 636, 639 (9th Cir.2007) (quoting *Sw. Voter Registration Educ. Project v. Shelley,* 344 F.3d 914, 918 (9th Cir.2003)) (en banc) (per curiam); *see also A & M Records,* 239 F.3d at 1013 (criteria form a "sliding scale" whereby the required degree of harm increases as the likelihood of success decreases); *United States v. Nutri–cology, Inc.,* 982 F.2d 394, 398 (9th Cir.1992) (same).

### A. Probability of Success on the Merits

Plaintiffs allege that Defendants (1) failed to prepare a required EIS, (2) failed to prepare an adequate Environmental Assessment, (3) failed to submit a consistency determination that included all federal activities that would affect California's coastal zone to the CCC for consistency review, (4) failed to carry out federal activities that affect California's coastal zone in a manner consistent with the CCMP, and (5) failed to prepare an adequate Biological Opinion (BiOp) and Incidental Take Statement (ITS). Having reviewed the voluminous evidence the parties have presented, the Court finds that Plaintiffs have demonstrated a probability of success on the merits of their first four causes of action, for violations of NEPA, the APA, and the CZMA, but not their fifth cause of action, for violation of the ESA.

### 1. The National Environmental Policy Act (NEPA)

Plaintiffs contend that Defendants violated NEPA by (a) failing to prepare an EIS despite the potential for the challenged exercises to have a significant impact on the environment and (b) by failing to prepare an adequate EA that considered the cumulative impacts of, and all reasonable alternatives to, the proposed actions.

In 1970, Congress passed the National Environmental Policy Act and declared "a national policy which will encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. The purpose of NEPA was "to promote efforts which will prevent or eliminate damage to the environment," as well as "to enrich the understanding of the ecological systems and natural resources important to the Nation." *Id.* NEPA does not contain any substantive requirements that dictate a particular result; instead, NEPA is aimed at ensuring agencies make *informed* decisions and "contemplate the environmental impacts of [their] actions." *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir. 1998); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (concluding that NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.").

In addition to aiding internal agency decisionmaking, preparation and publication of an EIS "also serves a larger informational role. It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment." *Robertson,* 490 U.S. at

349, 109 S.Ct. 1835 (internal quotations and citations omitted).

In pursuit of these goals, NEPA mandates the preparation of an EIS for all proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Ninth Circuit has interpreted this provision as requiring agencies to prepare an EIS "where there are substantial questions about whether a project *may* cause significant degradation of the human environment." *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir.2005) (emphasis in original). As the preparation of an EIS can be a costly and time-consuming process, agencies first complete an EA. 40 C.F.R. § 1508.9. If, based on this assessment, the agency concludes that the proposed actions will not significantly affect the environment, it may issue a "Finding of No Significant Impact" (FONSI) and forego completion of an EIS. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir.1988); 40 C.F.R. § 1508.13. Agencies must complete an EA and, as necessary, an EIS before reaching a final decision or making an "irreversible and irretrievable commitment of the availability of resources." *Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d 848, 852 (9th Cir.1979).

Defendants insist that they were not required to prepare an EIS, and that their issuance of a FONSI was proper, because the SOCAL exercises will not cause a significant impact on marine life. In the Ninth Circuit, courts reviewing an agency's decision not to prepare an EIS under NEPA "employ an arbitrary and capricious standard that requires [them] to determine whether the agency has taken a 'hard look' at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant."

*Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1239 (9th Cir.2005) (internal quotations and citations omitted). To prevail on a claim that an agency "violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.1998) (internal quotations and citations omitted).

The Court finds that Plaintiffs have raised substantial questions as to whether the SOCAL exercises will have a significant impact on the environment. Mass strandings of several species of whales following naval exercises have been documented in the Bahamas, the Canary Islands, Hawaii, North Carolina, Japan, Greece, Spain, Taiwan, the Madeira archipelago, and the U.S. Virgin Islands. (*See generally*, Horowitz Decl. Exs. 1–16.) Following comprehensive studies of these events, the International Whaling Commission's Scientific Committee concluded that "[t]he weight of accumulated evidence now associates mid-frequency, military sonar with atypical beaked whale mass strandings. This evidence is very convincing and appears overwhelming." (Horowitz Decl., Ex. 1, Annex K at 9.) A study sponsored by the Navy's own Office of Naval Research similarly concluded, "the evidence of sonar causation is, in our opinion, completely convincing and that therefore there is a serious issue of how best to avoid / minimize future beaching events." (Horowitz Decl., Ex. 17 at 1 (concluding that a lack of understanding regarding the damage mechanism precluded modifications to the sonar waveform as a mitigation strategy and proposing alternative mitigation measures).)

Defendants argue that the circumstances in each of these numerous other stranding events are unique and distinguishable from what will occur in southern California. Defendants note that they have been conducting naval exercises while using MFA sonar in the SOCAL range for thirty years and that there have been no strandings "alleged to be related to the Navy's use of MFA sonar," and that it simply "defies reason to argue that there have been adverse impacts that have gone unnoticed all that time." The Court disagrees.

First, in light of how challenging it is to detect even the presence of deep diving beaked whales and other cetaceans particularly vulnerable to MFA sonar, a lack of documented evidence of the disturbance, injury, or even death of marine mammals in a particular geographic area does little to prove that MFA sonar never caused such adverse effects. Indeed, in its 2006 U.S. Pacific Marine Mammal Stock Assessment, the National Oceanic and Atmospheric Administration (NOAA) noted in its discussion of mortalities caused by anthropogenic noise, such as MFA sonar, that "[s]uch injuries or mortalities would *rarely be documented*, due to the remote nature of many of these activities and the low probability that an injured or dead beaked whale would strand." (Horowitz Decl., Ex 46 at 151 (emphasis added).)

Second, the Navy's own EA predicts that the SOCAL exercises will disturb or injure nearly thirty species of marine mammals, including endangered and threatened species. As discussed above, the Navy's report concludes that its actions will result in approximately 170,000 instances of Level B harassment, including 8,000 temporary threshold shift (TTS) exposures and 466 cases of permanent injury to beaked and ziphiid whales. (Hajek Decl., Ex. 1 at 4–46 to 4–47.) The predicted permanent injury of 436 Cuvier's

beaked whales is especially significant in light of NOAA's estimate that there are as few as 1,211 such whales remaining off the entire U.S. west-coast. The EA also predicts 710 "takes," including twenty-eight TTS exposures, of blue whales, fin whales, humpback whales, sei whales, and sperm whales—all of which are endangered species.

Boxed in by its own findings, the Navy has argued that its environmental assessment, on which it based its decision not to prepare an EIS, is methodologically flawed and inaccurate. Defendants contend that the EA makes a number of assumptions that led it to overestimate the amount of harm the SOCAL exercises will cause, including: (1) marine mammals are uniformly distributed over the SOCAL range, (2) marine mammals have omni-directional hearing, (3) marine mammals would be exposed to the maximum sound intensity level based on their horizontal distance from its source, and (4) that marine mammals will not dive or exhibit other avoidance behavior.

The Court is simply not equipped to evaluate the merits of these contentions. It is not the place of lawyers or the Court to conduct a de novo review of the scientific conclusions of an agency, in this case revising the total number of takes and injuries by altering the underlying assumptions to the scientific study, and on that basis finding the SOCAL exercises will not have a significant impact on the environment. The Court has no basis with which to judge how and to what extent changing any of the challenged assumptions would impact the Navy's prior conclusions.

Moreover, it is not even clear that the assumptions necessarily led to an *over* estimation of the number of takes. For example, if marine mammals were not, in fact, uniformly distributed over the SOCAL

range, and instead were concentrated in the area where the exercises took place, even more marine mammals would be harassed or injured than the EA predicts. In addition, rapid diving and avoidance behavior prompted by the use of MFA sonar has been associated with injuries such as hemorrhaging around the brain, ears, kidneys, and acoustic fats, acute spongiotic changes in the central nervous system, and gas/fat emboli and lesions in the liver, lungs, and other vital organs. (Decl. of Sentiel Rommel ¶ 7.) Failure to take such avoidance behavior into account may therefore also have led the Navy to underestimate the number of takes that would occur.

Finally, Plaintiffs argue that Defendants' EA has additional methodological deficiencies, such as using highly trained, captive animals desensitized to anthropogenic noise to determine the sound level thresholds for harassment and injury, that lead it to "grossly underestimat[e] both the volume and severity of likely impacts on marine life." Although the number of takes listed in the EA are simply predictions, and may over or underestimate the actual harm that will occur, the Court is satisfied that the agency "made a reasoned decision based on its evaluation of the evidence." *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir.2003) ("Because analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies."); *Marsh v. Ore. Natural Res. Council, Inc.*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive.").

Based on the studies establishing a scientific consensus on the correlation between the use of MFA sonar and mass whale strandings, the evidence indicating MFA sonar disrupts activities critical to marine mammals' survival, such as food foraging and mating, and the conclusions of the Navy's own scientific study that the SOCAL exercises will cause 170,000 Level B harassment exposures and 466 permanent injuries to marine mammals, including five endangered species, the Court finds that Plaintiffs have raised substantial questions as to whether the SOCAL exercises will have a significant impact on the environment. Plaintiffs have therefore demonstrated a probability of success on their claim that the Navy's failure to prepare an environmental impact statement was arbitrary and capricious and in violation of NEPA and the APA.

The Court further finds that Plaintiffs have demonstrated a probability of success on their claims that Defendants' proposed mitigation measures were inadequate. An agency may avoid the requirement to prepare an EIS by adopting mitigation measures sufficient to eliminate any substantial questions over the potential for significant impact on the environment. *National Parks & Conservation Ass'n*, 241 F.3d at 733–34. ("In evaluating the sufficiency of mitigation measures, we consider whether they constitute an adequate buffer against the negative impacts that may result from the authorized activity. Specifically, we examine whether the mitigation measures will render such impacts so minor as to not warrant an EIS."). The mitigation measures Defendants have proposed in the instant case are far from sufficient to obviate the need for an EIS. Ironically, Defendants have actually reduced their mitigation efforts and adopted measures even less protective than those the Court previously found insufficient. (*See* CV 06–4131 FMC (FMOx), July 3, 2006, Temporary Restraining Order and

July 5, 2006, Order Denying Defendants' *Ex Parte* Applications.) The Navy has eliminated (1) its provisions requiring power-downs during surface ducting conditions (when sound travels greater distances), at night and in other low visibility conditions (when whales that would be affected are more difficult to see); (2) the twelve nautical mile coastal buffer zone, and (3) additional protection measures during "chokepoint" exercises.

What few mitigation measures remain continue to be ineffective. A "safety zone" of 1,000 yards, for example, does little to mitigate the impact of MFA sonar's effect on beaked whales where sound levels may not dissipate to sublethal levels for 5,000 meters. (*See* Horowitz Decl., Ex. 59 (acoustic energy map); Decl. of Linda Weilgart (noting mortality may occur at levels between 170–184 dB and as low as 150–155 dB); Decl. of Edward Parsons (Parsons Decl.) ¶ 17 (noting that sound can travel hundreds of miles under water).) The presence of visual monitors looking for whales is likewise of little value where beaked whales, which are the most susceptible to injury from MFA sonar, are regularly submerged in deep dives that last as long as sixty minutes. (Parsons Decl. ¶ 10; Horowitz Decl., Ex. 44 (study finding a 5 percent chance under ideal conditions of observing the presence of beaked whales close to a vessel, and a 0 percent chance of detecting a beaked whale at 1 kilometer using 7x binoculars).)

■ Plaintiffs have also demonstrated a probability of success on their claims that Defendants violated NEPA because their EA failed to consider reasonable alternatives or cumulative impacts. The Ninth Circuit has concluded that, in furtherance of NEPA's goal "that federal agencies infuse in project planning a thorough consideration of environmental values," federal agencies must sufficiently study, develop, and describe alternatives

as part of the "environmental decisionmaking process." *Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1228 (9th Cir.1988) (internal quotations and citations omitted). The environmental decisionmaking planning process requires the Navy to give "full and meaningful consideration" to reasonable alternatives. *Natural Resources Defense Council v. Evans,* 279 F.Supp.2d 1129, 1165–66 (N.D.Cal.2003); *see also National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 733 (9th Cir.2001) (". . . repeated generic statement that the effects are unknown does not constitute the requisite 'hard look' mandated by the statute if preparation of an EIS is to be avoided").

As the Ninth Circuit has explained:

consideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process. This is reflected in the structure of the statute: while an EIS must also include alternatives to the proposed action, 42 U.S.C. § 4332(2)(C)(iii)(1982), the consideration of alternatives requirement is contained in a separate subsection of the statute and therefore constitutes an independent requirement. *See id.* § 4332(2)(E). The language and effect of the two subsections also indicate that the consideration of alternatives requirement is of wider scope than the EIS requirement.

*Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1228–29 (9th Cir.1988).

■ It does not appear that Defendants adequately considered reasonable alternative mitigation measures, such as those proposed by the CCC, used by allies such as Australia during exercises employing MFA sonar, or even those the Navy itself employed during RIMPAC 2006. (*See* Hajek Decl., Ex. 1 at 5–5 to 5–8 (succinctly dismissing ten proposals with little analysis and failing to discuss other alternatives).) Defendants also failed to

consider any geographical alternatives, and its conclusory single sentence argument that the SOCAL range is "uniquely situated to support these exercises" is insufficient to show that any alternatives would have been unreasonable, making consideration unnecessary. *'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1100–01 (9th Cir.2006) (holding that Army violated NEPA by failing to consider a location other than Hawaii for transformation of an army brigade despite stated strategic importance of area and evidence that action was "critical for the training of soldiers in conditions that would arise in expected combat situations.").

Finally, Defendants failed to adequately consider the cumulative impacts of the SOCAL exercises. Despite the EA's conclusion that the SOCAL exercises will cause 8,000 TTS exposures and 466 instances of permanent injury, and evidence that the Navy regularly conducts unit level exercises using MFA sonar in the region, in one paragraph the EA dismissed the potential for cumulative impacts and concluded that the SOCAL exercises "would not have any significant contribution to the cumulative effects on marine mammals" based on the use of mitigation measures the Court has already found ineffectual. Although it is possible that the EA's findings could have been supported by further study and modeling incorporating the proposed mitigation measures, the EA's conclusion is unsupported by the assessment's current findings and model, and the failure to study and analyze the potential for such cumulative impacts in light of those findings renders the EA fatally inadequate. *See Klamath–Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir.2004) ("A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided. The analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." (internal quotations and citations omitted)).

## 2. The Coastal Zone Management Act (CZMA)

Plaintiffs contend that Secretary of the Navy Donald Winter and the United States Department of the Navy (Navy Defendants) violated the CZMA by submitting a CD to the CCC for the SOCAL exercises that did not take the planned use of MFA sonar into account and by failing to adopt the mitigation measures the CCC subsequently determined were necessary for the Navy's actions to comply with the CCMP. The CZMA requires that "[e]ach federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved state management programs." 16 U.S.C. § 1456(c)(1). Under the CZMA, agencies must comply with "the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency." 15 C.F.R. § 930.32(a)(1). Agencies must also submit a CD "for all Federal agency activities affecting any coastal use or resource" to the applicable state agency. 15 C.F.R. 930.34. Although the CZMA lacks a citizen suit provision, judicial review of agency compliance is available pursuant to the APA. *See, e.g., Friends of Earth v. United States Navy*, 841 F.2d 927, 936 (9th Cir. 1988); 5 U.S.C. §§ 701–06. The burden of demonstrating maximum consistency practicable with the CCMP rests with the Navy. *California Coastal Comm'n v. Unit-*

*ed States,* 5 F.Supp.2d 1106, 1112 (S.D.Cal. 1998).

■ The Navy Defendants argue that they were not required to analyze or discuss the proposed use of MFA sonar in the CD they submitted to the CCC because the MFA sonar use would not affect any coastal resources. For the reasons that Defendants' determination that the SO-CAL exercises would not have a significant impact on the environment was arbitrary and capricious, as discussed above, the Court finds that the Navy Defendants' determination that the use of MFA sonar in the SOCAL range would not affect any of California's coastal resources was similarly arbitrary and capricious and in violation of the APA.

■ The Navy Defendants have raised a number of additional arguments in support of their decision under the CZMA, none of which the Court finds persuasive. First, they contend that because the exercises will take place at least five nautical miles from shore, and often at least twelve nautical miles from shore, and because California's coastal zone extends only three nautical miles from shore, that there will be no impact on coastal resources. However, as discussed above, MFA sonar can affect marine mammals, designated as coastal resources by statute, from miles away. (*See, e.g.,* Parsons Decl. ¶ 17) (noting that "these military exercises may ensonify coastal waters, even though exercises may be conducted outside the coastal zone.") Moreover, consistency review is triggered regardless of where the harm occurs if it affects coastal resources, which include marine mammals that are periodically within the coastal zone. 16 U.S.C. § 1456(c)(1)(A) ("Each Federal agency activity within *or outside* the coastal zone that affects any land or water use or natural resource *of* the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs.") (emphasis added); *California v. Norton,* 311 F.3d 1162, 1172 (9th Cir.2002) (requiring consistency review of offshore oil leases where seismic surveys outside the coastal zone may permanently injure marine mammals); Jefferson Decl. ¶ 6 ("Most of the species regularly found in the exercise area may be expected to occur there within 3 nautical miles of shore, either exclusively as in the case of the coastal bottlenose dolphin or as part of their range").

Second, the Navy Defendants argue that temporary harassment of marine mammals is insufficient to constitute an "activity … that *affects*" a natural resource because it does not cause injury. Even if this were true, Defendants' own EA predicts the use of MFA sonar during the SOCAL exercises *will* cause 466 instances of permanent injury to beaked and ziphiid whales.

Third, the Navy Defendants insist that a consistency determination need not discuss an activity unless it will have a measurable impact on the "populations of marine mammals," and that, because there "have been no systematic declines in any marine mammal populations during the decades of MFA sonar use by the Navy," it was justified in not discussing its proposed use of MFA sonar. The Court has already addressed Defendants' "lack of documented population decline" argument in its discussion of Plaintiffs' NEPA claims, and it has even less force here where the burden rests on the Navy Defendants to demonstrate compliance. In addition, as the Ninth Circuit established in *California v. Norton,* federal activities "that may permanently injure marine mammals" affect coastal resources and require a consistency determination; an impact on entire populations is not required. 311 F.3d at 1172 n. 5. Moreover, Plaintiffs have presented evidence that the use of MFA so-

nar *can* detrimentally impact entire populations of species, given its potential to disrupt feeding and mating as well as damaging marine mammals' primary sense. (Parsons Decl. ¶¶ 7–9) (concluding that "there is significant potential for population-level effects from individual JTFEX and COMPTUEX exercises" and that even displacement from non-injurious, relatively low energy level sonic harassment "could have population-level effects, particularly if the displacement coincides with seasonal breeding or foraging.").

Finally, the Navy Defendants argue that the mitigation measures the CCC required the Navy to employ during the SOCAL exercises in order to comply with the CCMP are not, in fact, required in order for the Navy to comply with the CCMP. They argue that the mitigation measures the Navy and NMFS have developed are sufficient "to maintain healthy populations of marine mammals in SOCAL." (Opp'n 23:14–15.) Defendants' proposed mitigation measures are woefully inadequate and ineffectual, as discussed above, and Defendants have failed to establish that the CCC's proposed mitigation measures are either unnecessary or not required under the CCMP. Accordingly, the Court finds that Plaintiffs have demonstrated a probability of succeeding on the merits of their claims under the CZMA.

**3. The Endangered Species Act (ESA)**

■ Plaintiffs' fifth cause of action, against the National Marine Fisheries Service, Assistant Administrator for Fisheries William Hogarth, Administrator of the National Oceanographic and Atmospheric Administration Vice Admiral Conrad Lautenbacher Jr., and Secretary of the Department of Commerce Carlos Gutierrez (collectively NMFS Defendants), alleges that the NMFS Defendants failed to prepare an adequate Biological Opinion (BiOp) and Incidental Take Statement (ITS) in violation of the ESA and APA.

Although courts have vacated BiOps and ITSs that contained "structural flaws," the Court is satisfied that the NMFS Defendants in this case met their statutory obligation to "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 481 F.3d 1224, 1239 (9th Cir.2007) (upholding a finding that NMFS violated the ESA where, "[a]t its core, the 2004 BiOp amounted to little more than an analytical slight [sic] of hand, manipulating the variables to achieve a 'no jeopardy' finding. Statistically speaking, using the 2004 BiOp's analytical framework, the dead fish were really alive. The ESA requires a more realistic, common sense examination.").

Plaintiffs argue that NMFS's BiOp and ITS did not "use the best scientific and commercial data available" because they relied on the Navy's flawed acoustic models and adopted the Navy's exposure thresholds from its EA to determine the number of takes. As discussed above, the Court is satisfied with the methodology and conclusions employed by the agency experts in reaching their conclusions as to the number of takes. It does not find that there are any "structural flaws" in the BiOp or ITS, and, as Defendants note, NMFS properly considered the vast universe of available data on the impact of MFA sonar.

Plaintiffs also argue that NMFS's analysis of acoustic impacts on endangered and threatened fish species were inadequate and that NMFS failed to consider cumulative impacts. The Court disagrees. Having carefully reviewed the BiOp and ITS, it finds that these issues were properly considered and, unlike the conclusory findings regarding cumulative impacts in the Navy's EA, sufficiently analyzed. Accordingly, the Court finds that Plaintiffs have failed to demonstrate a probability of suc-

cess on their claim against the NMFS Defendants for violation of the ESA and APA.

### B. Possibility of Irreparable Harm

Plaintiffs have demonstrated that MFA sonar can injure and kill marine mammals, as well as cause population-affecting levels of disruption. Defendants' own study concludes that the SOCAL exercises in particular will cause widespread harm to nearly thirty species of marine mammals, including five species of endangered whales, and may cause permanent injury and death.

Where, as here, plaintiffs demonstrate a strong likelihood of prevailing on the merits of their claims, injunctive relief is appropriate where there is a "possibility of irreparable harm." *Faith Ctr. Church Evangelistic Ministries v. Glover,* 480 F.3d 891, 906 (9th Cir.2007); *Earth Island Inst. v. United States Forest Serv.,* 442 F.3d 1147, 1159 (9th Cir.2006); *Cmty. House, Inc. v. City of Boise,* 468 F.3d 1118, 1123 (9th Cir.2006). The Supreme Court has held that, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *see also Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1125 (9th Cir.2005).

 From the numerous scientific studies, declarations, reports, and other evidence before the Court, Plaintiffs have established to a near certainty that use of MFA sonar during the planned SOCAL exercises will cause irreparable harm to the environment and Plaintiffs' standing declarants. The Court is also satisfied that the balance of hardships tips in favor of granting an injunction, as the harm to

the environment, Plaintiffs, and public interest outweighs the harm that Defendants would incur if prevented from using MFA sonar, absent the use of effective mitigation measures, during a subset of their regular activities in one part of one state for a limited period. Accordingly, the Court grants Plaintiffs' requested relief and enjoins Defendants' use of MFA sonar during the remaining SOCAL exercises.

### CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Defendants' Motion to Dismiss or Stay (docket no. 14). In addition, Defendants' request during oral argument for a stay of the requested injunctive relief pending appeal is **DENIED.**

The Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction (docket no. 21) as to Plaintiffs' first four causes of action, for violations of NEPA, the CZMA, and the APA, and **DENIES** Plaintiffs' Motion as to Plaintiffs' fifth cause of action for violation of the ESA and the APA.

Defendants are hereby enjoined from using MFA sonar during the fourteen challenged COMPTUEX and JTFEX exercises planned in the SOCAL range through January 2009.

**IT IS SO ORDERED.**